**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BEN WASHINGTON,<br>individually and on behalf of the class<br>defined herein, | ) <br> ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | 1: 08 CV 2823<br>Judge Kocoras |
| vs. | ) <br> ) | Magistrate Judge Cox |
| NORTH STAR CAPITAL ACQUISITION LLC, | ) <br> ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO MOTION TO DISMISS**

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Thomas E. Soule
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

Plaintiff Ben Washington alleges that defendant North Star Capital Acquisition, LLC ("North Star") violated the Illinois Collection Agency Act, 225 ILCS 425/1 *et seq.* ("ICAA"), the Fair Debt Collection Practices Act, 15 U.S.C. §§1692e and 1692f ("FDCPA"), and the Illinois Consumer Fraud Act, 815 ILCS 505/2 ("ICFA"). Plaintiff alleges that North Star sought collection of an alleged debt to which it had no title. These collection activities were unfair and deceptive, and violated a new law designed to prevent such abusive practices. These allegations state a claim for relief; therefore, North Star's motion to dismiss must be denied.

## I. THE ILLINOIS COLLECTION AGENCY ACT

### A. *Debt collection prior to the passage of the 2007 amendment*

In August 2007, the ICAA was amended to address debt buyers' repeated abuses. PA 95-437. The Attorney General of Illinois sponsored the amendment, which provides that effective January 1, 2008, debt buyers would be defined as "collection agencies" under the ICAA, making them subject to the ICAA. [Exhibit A (Sept. 17, 2007 press release by Atty. Gen. Madigan).]

Abusive collection practices included debtors resolving a debt with a debt collector "A," and then being sued or dunned for the same debt by debt collector "B" [Complaint, ¶¶2-4], and attempting to collect a debt without any right to do so [*Id.*, ¶¶5-7]. An article published in the trade press around the time when the ICAA amendment was introduced reported on "horror stories: The same portfolio is sold to multiple buyers; the seller doesn't actually own the portfolio put up for sale...." [Exhibit B (C. Petry, "Do your homework; Dangers often lay hidden in secondary market debt portfolio offerings;" *Collections & Credit Risk*, March 2007).]

Some debts are sold between debt collectors with no title. Recently, a debt broker was held liable for such activity. *RMB Holdings LLC v. Goldberg & Assocs. LLC*, Case No. 3:07CV406 (E.D.Tenn.), Docket No. 24 at 3 [Exhibit C], found that a debt buyer "began making attempts to collect the accounts it purchased" from a broker, even though that broker "never delivered title or ownership of the accounts." This episode "points to gaps in professionalism and ethics that taint the entire industry." [Exhibit D (*Collections & Credit Risk*, April 2008 at 8).]

Similarly, in 2004 the FTC shut down CAMCO, a notorious Illinois debt buyer. The

FTC found that "CAMCO buys old debt lists that frequently contain no documentation about the original debt.... CAMCO makes efforts to find people with the same name in the same geographic area and tries to collect the debt from them – whether or not they are the actual debtor. In papers filed with the court, the FTC alleges that CAMCO agents told consumers – even consumers who never owed the money – that they were legally obligated to pay." [Exhibit E (FTC press release of Dec. 8, 2004).]   The last of the defendants signed a consent decree on January 23, 2007, a few days before the  2007 amendment to the ICAA was introduced.  *FTC, et al v. Capital Acquisitions, et al.*, Case No. 1:04CV7781 (N.D.Ill.), Docket No. 380.

In January 2007, Attorney General Madigan sued Arrow Financial, which both purchases debts and collects debts for others. [Exhibit F (Complaint in *People v. Arrow Fin. Servs. LLC*, Case No. 07CH2475 (Cook Co. Cir. Ct.)), Complaint at ¶¶9-10.] The complaint alleged that Arrow "attempts to collect on... debts that have been settled," apparently by prior owners or their agents, and debts that are time-barred or discharged. [*Id.*, ¶¶12-13.]

> B.     *The ICAA amended extends the statute's reach to debt buyers and provided safeguards, such as requiring proper evidence of assignment or title*

Extending the ICAA to debt buyers was accomplished by defining debt buyers as "collection agencies" and their activities as "collection."  The amended definition of "collection agency" in 225 ILCS 425/3(d) brings debt buyers under the ICAA by providing that "a person, association, partnership, corporation, or other legal entity acts as a collection agency when he or it... buys accounts, bills or other indebtedness and engages in collecting the same."  Previously, coverage was limited to a person who "buys accounts, bills or other indebtedness *with recourse* and engages in collecting the same." [Emphasis added.]  By deleting "with recourse," the legislature intended to classify as a "collection agency" entities such as North Star, which buy charged-off debts for their own account. [Exhibit G (redline version of amendment).]  Furthermore, "debt collection" is now defined as "any act or practice in connection with the collection of consumer debts," and "debt collector," "collection agency," and "agency" mean "any person who, in the ordinary course of business, regularly, *on behalf of himself or herself* or others, engages in debt collection."  225 ILCS 425/2 (emphasis added).

The ICAA amendment added several provisions to "afford Illinois consumers greater

protections from abusive debt collection practices." [Exhibit A.]  Provisions regulating third party contacts (225 ILCS 425/9.1), harassment of debtors (225 ILCS 425/9.2), and requiring notification of rights (225 ILCS 425/9.3) were added.  Another section prescribes procedures for handling claims of identity theft (225 ILCS 425/9.4).  The Attorney General was authorized to enforce the ICAA using her authority under the ICFA (225 ILCS 425/9.7).

The statement jointly issued by the Attorney General and the House and Senate sponsors of the 2007 amendment [Exhibit A] stated that it was intended to apply the existing statute to debt buyers, and to add additional regulations. One problem the amendment addressed was the filing of thousands of collection lawsuits by debt buyers without proper documentation:

> Madigan noted that consumer advocates attribute the rise in debt collection complaints to a number of factors.  These factors include the explosive growth of the debt buyer industry in recent years and the rise in consumer debt.  Debt buyers, some of whom collect old debt that they purchase for pennies on the dollar, file cases by the thousands in overworked courts and sometimes fail to keep track of critical information, such as proof of the original debt and payment records.  Debt buyers have not been covered under existing state law until now. [*Id.*]

Furthermore, the floor debate in the Illinois House, prior to passage, explained that the amendment "extends the provisions of this Act to those who so-called buy debt" [*sic*], without exclusion of any particular provisions. [Exhibit H (transcript of House debate of May 30, 2007).]

Nevertheless, North Star asserts that the ICAA does not reach debt buyers and permits debt buyers to continue to file hundreds of collection lawsuits without proper documentation, and that "the ICAA is not (and cannot) be designed to protect litigants (like plaintiff) in state court lawsuits" (Memo. at 7), even though that was exactly what the amendment meant to accomplish.

## II.   DEFENDANT'S CLAIM THAT THE ICAA DOES NOT APPLY IS BASED ON AN IMPROPER  ATTEMPT TO IGNORE THE STATUTORY DEFINITIONS

North Star's claim that the assignment provision of 225 ILCS 425/8b does not apply to debt buyers ignores the principle that statutory definitions must be followed, even if inconsistent with the defined terms' normal meaning.  *People v. Perry*, 224 Ill. 2d 312, 326-327; 864 N.E.2d 196 (2007); *Concrete Mats. Corp. v. Gordon*, 395 Ill. 203, 207-208, 69 N.E.2d 841 (1946); *Western Union Tel. Co. v. Lenroot*, 323 U.S. 490, 502-03 (1945) ("statutory definitions of terms used therein prevail over colloquial meanings").  For example, in *Western Union*, telegrams were

3

held to constitute "goods" within the Fair Labor Standards Act since the statute defined "articles of commerce" as "goods," though electricity traveling through a wire is not "goods" in normal English and its scientific characteristics are incompatible with "goods."[1]

Defendant cites *Sprint Comms. Co. LP v. APCC Servs., Inc.*, 128 S.Ct. 2531 (2008) to show that the purchase of a debt is not an "assignment for collection" under the ICAA.  First, *Sprint* had nothing to do with the ICAA.  More importantly, *Sprint* noted that, in several cases, the right to assign was regulated by statutes which modified the common law right.  *Id.* at 2538.  This is in no way unusual.  Rights of individuals under common law are modified by a myriad of statutes and regulations – including those designed to protect consumers such as the ICAA.

North Star completely ignores the statutory definitions in the ICAA as amended, instead choosing to cite several cases *not* arising under the ICAA.  Thus, North Star concedes that applying these definitions destroy its position. The amended ICAA expressly and repeatedly expands the ICAA's scope by defining debt buyers as "collection agencies" and the activities of debt buyers as "collection."  While this is not the common meaning of "collection agency," the General Assembly had the right to impose a definition of its choosing.  And if a debt buyer is a "collection agency," and the activities of a debt buyer are "collection," then the transfer of a debt to a debt buyer to engage in such activities is an "assignment for collection."

Not only did the sponsors of the legislation [Exhibits A & H] expressly intend to extend the ICAA to debt buyers, but the words "collection agency," "collection" and their derivatives (*e.g.*, "collect," "collecting") are repeatedly and consistently used in the statute. 225 ILCS 425/3 defines "collection agency" to include debt buyer.  Regarding licensing, 225 ILCS 425/4 states that "no collection agency shall operate in this State, directly or indirectly engage in the business of collecting, solicit claims for others, have a sales office, a client, or solicit a client in this State, exercise the right to collect, or receive payment for another of any account... without registering under this Act except that no collection agency shall be required to be licensed or maintain an established business address in this State if the agency's activities in this State are limited to

---

[1] Electricity is the flow of electrons; electricity itself has zero mass.  "Goods" are tangible.

collecting debts from debtors located in this State by means of interstate communication... from the agency's location in another state provided they are licensed in that state and these same privileges are permitted in that licensed state to agencies licensed in Illinois." 225 ILCS 425/14 criminalizes "engaging in the collection of debts without first having obtained a certificate pursuant to this Act, or carrying on such business after expiration of the certificate or after receipt of a notice of revocation or suspension of the certificate...."  It does not make sense that references to "collection" in §§3, 4, 8b and 14 have entirely different meanings.

In giving effect to the General Assembly's intent, an Illinois court considers, in addition to the statutory language, the reason for the law, the problems to be remedied, and the objects and purposes sought to be attained by it.  *In re Madison H.,* 215 Ill. 2d 364, 373, 830 N.E.2d 498 (2005);  *Warner v. King*, 267 Ill. 82, 87, 107 N.E. 837, 839 (1915). The result produced by the statutory definitions is consistent with the purpose of (1) §8b, which is to protect debtors against being sued or dunned twice for the same debt (per *Business Serv. Bureau, Inc. v. Webster*, 298 Ill. App. 3d 257; 698 N.E.2d 702 (4th Dist. 1998)), (2) the 2007 amendment, which subjected debt buyers to the ICAA and sought to insure that debt buyers had proper documentation before suing on debts, and (3) the purpose of the ICAA as a whole which, under 225 ILCS 425/1a, is "to protect consumers against debt collection abuse."

If the original creditor brings suit, the defendant knows if he has dealt with the plaintiff. This is not the case when suit is brought by an assignee who obtains rights in a debt after default.

Prior to the rise of the debt-buying industry and the extension of the ICAA to debt buyers, ICAA §8b ensured that traditional "collection agencies" that claimed to have title to debts for purposes of suit  – the only post-default assignees bringing suit  –  actually did have the claimed rights, by mandating that they have an "assignment" that is "properly executed and acknowledged by the corporate authority or individual transferring title to the collection agency before any action can be taken in the name of the collection agency."  225 ILCS 425/8b(c).  This expands upon the common law requirement that any "assignment" must designate or identify the right, claim or fund that is being transferred in order to be valid.  *Assoc. Metals & Minerals Corp. v. Muhendisi*, 6 Ill.App.2d 548, 552, 128 N.E.2d 595, 597  (1st Dist. 1955).

Following the growth of the debt-buying industry, the Attorney General found that debt buyers' filing of lawsuits alleging ownership of debts was no guarantee that they owned the debts, that the debts were still outstanding, or that the right person was sued. In other words, the problems that led to the initial adoption of ICAA §8b existed with the same or greater frequency in the case of debt buyers, requiring extension of the same protections to consumers to better protect against abuses that the ICAA exists to prevent. Just as in the case of suits by traditional "collection agencies," requiring a document signed by the party transferring title to "an account" to the debt buyer "collection agency" reduces the likelihood of debt buyers suing when they have no right to do so, either because they have not acquired the debt or it was paid while owned by the transferor. Requiring the transferor to sign a document identifying the account being transferred also minimizes the sort of fraud committed by CAMCO, described *supra*.

Moreover, because many firms both collect for others and purchase debt, there should have been no great burden. Plaintiff believes that the evidence will show that North Star is filing suit on debts even though it does not beneficially own them. Indeed, the affidavit attached to North Star's collection complaint [Exhibit I] states that North Star is "the purchaser or assignee of [Mr. Washington's] account from the original creditor...." One cannot assume from the papers filed by North Star that it claims title to the alleged debt.

Defendant's argument that "it would be ludicrous to require a debt buyer who has acquired all rights to a debt pursuant to an assignment to notify the original creditor of its intent to file suit for collection of the debt" under §8a-1 (Memo. at 5) is belied by the abuses intended to be curbed by the ICAA. Once these are understood to include filing suit on debts that the plaintiff does not own or that have been resolved, the notification requirement makes sense. A creditor (defined as the party that extends credit per 225 ILCS 425/2) that, for example, receives two notices for the same debt is likely to inform the authorities to avoid being accused of selling the same debt twice. In any event, plaintiff relies on §8b and prior common law, not §8a-1, and defendant's argument does not suggest that debt buyers can sue without proper assignments as required by §8b or prior common law.

North Star's argument thus boils down to the claim that the failure of the drafter of the

6

amendment to change "assignee *for* the creditor" in §8b to "assignee *of* the creditor" defeats the stated intent to (1) extend the existing ICAA to debt buyers and (2) address the problem of debt buyers filing collection lawsuits without proper documentation. Indeed, given the second purpose it would be more than strange that the one provision of the ICAA the Legislature did *not* apply to debt buyers is the *only* provision which imposes specific documentation requirements relating to particular accounts, namely §8b, and which is well-calculated to prevent the filing of suits on debts which are not owned or have been paid, or against the wrong consumer.

Legislatures have frequently used inapt prepositions, even when drafting legislation *ab initio*; the method used to extend the ICAA – adopting broader definitions for an existing statute – makes this sort of error likely.  When faced with inapt grammar or punctuation, the Court should ascertain the meaning consistent with the legislative intent and apply it. In statutory construction, "the courts are not confined to the literal meaning of the words in the statute, but the intention may be collected from the necessity or objects of the act, and its words may be enlarged or restricted according to its true intent." *People ex rel. Barrett v. Anderson*, 398 Ill. 480, 489, 6 N.E.2d 773, 777 (1947) (statute construed to mean "township" where "village" used in error).  See *U.S. v. Vickery*, 199 F.Supp.2d 1363 (N.D. Ga. 2002) (Controlled Substance Analogue Act was written in an exceptionally awkward manner, leaving it unclear how many of three clauses defining the prohibited substances had to be satisfied in a particular case; the Court determined that the correct reading was that a substance was prohibited if it satisfied Clause A + [Clause B or Clause C]; statute was so construed even though court in effect inserted "Clause A + [Clause B or Clause C]" into the text); *People v. Poole*, 284 Ill. 39; 119 N.E. 916 (1918) (inapt expression in statute construed in accordance with obvious intent); *Warner v. King, supra*, 267 Ill. 82, 87, 107 N.E. 837, 839 (1915) (inapt grammar ignored when inconsistent with statute's purpose); *Indianapolis v. Huegele*, 115 Ind. 581, 18 N.E. 172 (1888) ("of" treated as grammatical error and disregarded).  The Seventh Circuit followed *Vickery* in *U.S. v. Turcotte*, 405 F.3d 515, 522 (7th Cir. 2005).  The intent of the amendment was to make the ICAA applicable to debt buyers, and in particular to require that debt buyers have proper documentation before filing collection suits.  This intent should be carried out.

7

At least one court has dismissed a collection complaint for failure to comply with ICAA §8b.  [Exhibit J (*Unifund v. Cox*, 08 AR 22 (DuPage Co. Cir. Ct. April 11, 2008)).]

## III.    NORTH STAR IS LIABLE FOR VIOLATIONS BASED ON LAWSUITS THAT ARE FILED IN ITS NAME

North Star repeatedly attempts to mischaracterize plaintiff's claims as claims that seek to punish the actions of North Star's attorneys, and not North Star itself.  (Memo. at, *e.g.*, 5 n.4, 7, 13.)  Plaintiff claims that defendant files suit on debts to which it does not have title.  The offending lawsuits were filed in the name of North Star – not its attorney.  North Star's collection complaint against Mr. Washington [Exhibit I] included an affidavit executed by a purported "agent" of North Star, which asserts that North Star "is the purchaser or assignee of the Defendant's account from the original creditor..."  Plaintiff does not seek to "regulate the practice of law," but to regulate the practices of debt buyers who are subject to the ICAA. (Memo at 5 n.4).  North Star bears the responsibility for actions taken in its name.

Filing a lawsuit to collect a consumer debt is an "exercise [of] the right to collect" (225 ILCS 425/4) and an "act... in connection with the collection of consumer debts" (225 ILCS 425/2) in Illinois.  Illinois courts hold, both in cases arising under the ICAA and otherwise, that litigation is a form of debt collection.  *Business Serv. Bureau v. Webster*, *supra*; *Petrick v. Kaminski*, 68 Ill.App.3d 649, 386 N.E.2d 636 (1st Dist. 1979).  Similarly, federal courts applying the FDCPA – sections of which were adopted essentially *verbatim* by the 2007 ICAA amendments, (225 ILCS 425/9.1, 9.2, and 9.3) – hold that litigation is a form of debt collection. *Heintz v. Jenkins*, 514 U.S. 291, 292, 297, 299 (1995) ("litigating.... seems simply one way of collecting a debt"); *FTC v. Check Investors, Inc.*, 502 F.3d 159, 173 (3d Cir. 2007); *Farber v. NP Funding II, LP*, 1997 U.S.Dist. LEXIS 21245, *15 (E.D.N.Y. Dec. 9, 1997).

Since litigation is a means of collecting a debt, the "exercise of the right to collect" and an "act... in connection with the collection of consumer debts" includes the filing and prosecution of suits seeking collection of debts. Indeed, the ICAA §8b expressly regulates collection actions.

The ICAA is directed to defendant, not to its counsel.  North Star (not its attorneys) is seeking relief; it is not entitled to argue that, contrary to the complaint allegations, the violation

resulted from an error by the attorney and that North Star had nothing to do with it.

The exclusion for attorneys in the ICAA's definition of debt collector (225 ILCS 425/2.03(5)), and the reservation to the Illinois Supreme Court of the right to regulate attorneys (Memo. at 5 n.4 and 7), both negate rather than support defendant's argument.  All lawsuits by "collection agencies" must be filed by licensed attorneys.  ICAA §8b expressly regulates litigation conduct; no collection litigation may take place without a proper assignment.  So unless the burden of complying with the ICAA is the duty of the "collection agency," §8b applies to no one.  And "courts do not read statutes to make entire subsections vanish into the night." *Bullard v. Burlington Northern*, 2008 U.S. App. LEXIS 16426, *4 (7th Cir. Aug. 1, 2008).  The only reasonable conclusion is that the ICAA mandates that a collection agency comply with its provisions in connection with lawsuits that are brought by the collection agency as plaintiff.

The argument that "Illinois does not allow for vicarious or derivative liability under the ICFA" (Memo. at 13) suffers from the same defect.  Cases cited by North Star merely hold that there is no liability under the ICFA for accepting the fruits of a violation committed by someone else who was not the defendant's agent (*Zekman v. Direct Am. Marketers*, 182 Ill.2d 359, 695 N.E.2d 853 (1988), and *Costa v. Mauro Chevrolet*, 390 F.Supp. 720, 733 (N.D.Ill. 2005)), and when a Federal statute bars the imposition of liability on an assignee, the ICFA cannot be used to undermine that restriction.  *Jackson v. S. Holland Dodge*, 197 Ill.2d 39, 755 N.E.2d 462 (2001).

## IV.    THE NOTION THAT THE GENERAL ASSEMBLY ELIMINATED THE PRIVATE RIGHT OF ACTION UNDER THE ICAA IS FRIVOLOUS

Defendant claims that the ICAA amendment abrogated the private right of action under the ICAA.  The facts negating this argument are as follows:

A.    In 1979, the Appellate Court held that there is a private right of action for ICAA violations.  *Sherman v. Field Clinic*, 74 Ill.App.3d 21, 392 N.E.2d 154 (1st Dist. 1979).

B.    In 1982, the Illinois Supreme Court approved this conclusion.  *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 89 Ill. 2d 379, 386, 432 N.E.2d 849 (1982).

C.    In 1995, the General Assembly recognized the cause of action, by enacting a statute of limitations for it.  225 ILCS 425/9.5, added by PA 89-387, §95 (effective Jan. 1, 1996).

D.      At least 20 other amendments to the ICAA were made between 1979 and 2007. PA 78-1248, 80-983, 82-149,  84-242,  84-1299, 86-615, 86-1472, 87-492, 87-1031, 87-1200, 88-45, 88-363, 89-474, 90-673, 91-239, 91-454, 91-613, 91-768, 93-896 and 94-414.

E.      The entire ICAA was reenacted in 1995 and 2005 because it was scheduled to be repealed under the Regulatory Sunset Act, 5 ILCS 80/1 *et seq*.  See 5 ILCS 80/4.26 (current Jan. 1, 2016 expiration date) and former 5 ILCS 80/4.8 (Dec. 31, 1995 expiration) and 4.16 (Jan. 1, 2006 expiration).  Ten years is the maximum allowable extension.  5 ILCS 80/12.  The legal effect of extending the "sunset" date is reenactment of the entire statute.  See *Olmstead v. Arthur J. Gallagher & Co.*, 32 Cal.4th 804, 815-816, 86 P.3d 354, 11 Cal.Rptr.3d 298 (2004).

F.      In 2007, Attorney General Madigan drafted amendments to "afford Illinois consumers greater protections from abusive debt collection practices." [Exhibit A.]

North Star claims that because certain violations of the ICAA were deemed important enough to be also made violations of the ICFA, so that the Attorney General could utilize her ICFA enforcement powers, application of *Sherman* means that the ICAA private right of action was abrogated.  Once the statute's history is set forth, North Star's claim becomes frivolous.

The Illinois Supreme Court has held "that when the legislature amends a statute, but leaves unchanged portions which have been judicially construed, the unchanged portions will retain the construction given prior to the amendment."  *People v. Agnew*, 105 Ill.2d 275, 280, 473 N.E.2d 1319, 1322 (1985).  This principle of "legislative adoption" applies with particular force where (a) the statute is repeatedly considered by the Legislature and amended, (b) one of the changes is premised on the construction being correct and (c) the General Assembly twice reenacted the ICAA pursuant to a Sunset Act that exists for the very purpose of forcing it to periodically determine that continuation of the law as written is desirable and which requires the presentation of studies and reports on whether continuation serves the public interest.  5 ILCS 80/5 to /7.  "From this history it is apparent that the legislature has acquiesced in the court's construction of the statute, which has by now become part of the fabric of the [statute]." *Charles v. Seigfried*, 165 Ill. 2d 482, 492, 651 N.E.2d 154 (1995).

If the General Assembly did not mean to adopt the conclusion in *Sherman* and *Jarvis* that

10

ICAA violations were privately actionable, it would not have enacted in 1995 a provision that the period of time within which such actions could be brought is five years or reenacted the ICAA twice. Defendant's argument that the 2007 change intended to "afford Illinois consumers greater protections" actually deprived them of their rights entirely, and *sub silentio* changed the time within which a lawsuit under the ICAA may be brought to zero, instead of five years, is wrong.

## V.    PLAINTIFF DOES NOT COMPLAIN ABOUT THE FORM A STATE COURT PLEADING SHOULD TAKE

Defendant repeatedly attempts to argue that plaintiff is merely complaining about the form a state court pleading should take, in an effort to trivialize plaintiff's claim. However, in other litigation, when representing debt buyers, North Star's counsel characterized collecting debts to which one does not have legal title as fraudulent and malicious. [Exhibit K (Complaint, *Hudson & Keyse, LLC v. Goldberg & Assoc., LLC*, 07-81047 (S.D.Fla., filed Nov. 5, 2007).] Plaintiff agrees; it is no less so when considered from the perspective of the putative debtors.

Defendant points to the allegation about no assignment being attached. (Complaint, ¶26.) Illinois requires documents on which an action is founded to be attached to the complaint, or the pertinent portion of the text "recited therein," or its absence explained by an affidavit. 735 ILCS 5/2-606. If an action is founded on a written contract, the contract must be attached or quoted. If the contract does not refer to the party seeking to enforce it, any documents transferring the contract rights to that party are documents on which the action is founded. That is the import of *Candice Co. v. Ricketts*, 281 Ill.App.3d 359, 362, 666 N.E.2d 722 (1st Dist. 1996), and was followed in *Ramirez v. Palisades Collection, LLC*, 2008 U.S. Dist. LEXIS 48722 (N.D.Ill., June 23, 2008). Whether the underlying contract was a construction contract creating a mechanics lien, a note and mortgage, or some other type of contract is not relevant to the principle that the document transferring rights to the state court plaintiff is a document on which the action is founded just as much as the underlying contract. Finally, if a document should be attached but is not, the failure to do so gives rise to an inference or presumption that no such document exists. *Barnes v. Peoples Gas Light & Coke Co.*, 103 Ill.App.2d 425, 428, 243 N.E.2d 855 (1st Dist. 1968) ("The complaint does not purport to be based on a written instrument such as a tariff. If it

were, then, of course, the relevant portions of that instrument would have to be recited in, or attached to, the pleading, and, as indicated, they were not"); *O.K. Electric Co. v. Fernandes*, 111 Ill.App.3d 466, 444 N.E.2d 264, 266-67 (2d Dist. 1982) ("Unless the complaint purported to be based upon a written instrument, it is assumed to be an oral contract").

Since no assignment was attached, it is presumed that no document exists which effects "the transfer of a designated or identified right, claim or fund" to defendant. *Assoc. Metals & Minerals Corp. v. Muhendisi, supra*, 6 Ill.App.2d at 552, 128 N.E.2d at 597. Not only did defendant not attach a document that complies with §8b, but there is no assignment at all. Thus, even apart from §8b, North Star filed suit on a debt without title. At any rate, the underlying claim is that North Star committed fraud by filing suits without having title to debts, not that pleading rules were not complied with.

After attempting to trivialize plaintiff's complaint, defendant cites three cases: *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, (7th Cir. 2007); *Wade v. Reg'l Credit Ass'n*, 87 F.3d 1098 (9th Cir. 1996), and *Olvera v. Blitt & Gaines PC*, 431 F.3d 285 (7th Cir. 2005). (Memo. at 11-13.) None of the three supports defendant's argument that filing suit on debts without legal title to them is not an FDCPA violation.

In *dicta*, *Beler* raised without deciding the issue of whether "the FDCPA controls the contents of pleadings filed in state court." *Beler*, 480 F.3d at 473. However, this *dicta* was plainly motivated by a concern that the FDCPA might be used to control "which facts, and how much detail" should be included in state court filings or to require attorney debt collectors to "write at a sixth-grade level." *Id.* *Beler* actually suggests that pleadings are not exempt from the FDCPA's "rule against trickery" – namely, 15 U.S.C. §1692e prohibition on false or misleading means. *Id.* This is in line with prior Seventh Circuit decisions, which expressly allow §1692e claims to be based on statements in pleadings. *Gearing v. Check Brokerage Corp.*, 233 F.3d 469, 472 (7th Cir. 2000); *Veach v. Sheeks*, 316 F.3d 690, 691-692, 693 (7th Cir. 2003) (applying the FDCPA to the content of "a summons and complaint for Indiana small claims court proceedings").

Decisions applying *Beler* permit claims based on false statements, as opposed to claims

that a pleading would not be understood by an uneducated person. *Foster v. Velocity Invs., LLC*, 2007 U.S. Dist. LEXIS 63302 (N.D.Ill., Aug. 24, 2007); *Chavez v. Bowman, Heintz, Boscia & Vician*, 2007 U.S. Dist. LEXIS 61936 (N.D.Ill., Aug. 22, 2007); *Guevara v. Midland Funding NCC-2 Corp.*,, 2008 U.S. Dist. LEXIS 47767 (N.D.Ill., June 20, 2008), *Jenkins v. Centurion Capital Corp.*, 2007 U.S. Dist. LEXIS 85218 (N.D.Ill., Nov. 15, 2007). "Debt collectors may not make false claims, period." *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004).

    More recently, the Seventh Circuit has recognized that the FDCPA compels reference to state law to define many violations, holding that "although a violation of state law is not in itself a violation of the federal Act," citing *Beler*, "a threat to impose a penalty that the threatener knows is improper because unlawful [under state law] is a good candidate for violation of sections 1692d and e." *Evory v. RJM Acquisitions Funding, LLC*, 505 F.3d 769, 778 (7th Cir. 2007). Indeed, one cannot determine whether a debt collector has falsely represented the "the character, amount, or legal status" of a debt or what "compensation... may be lawfully received by any debt collector for the collection of a debt" (15 U.S.C. §1692e(2)) or whether action can "legally be taken" (15 U.S.C. §1692e(5)) without reference to non-FDCPA law.

    Significantly, the FDCPA has been amended to specify limited circumstances under which pleadings are *not* covered by certain provisions. By reasonable implication, these are the *only* examples. Sections 1692e(11) and 1692g(d) exempt legal pleadings from the FDCPA in two limited, specific, and clearly delineated circumstances. Section 1692e plainly and unambiguously states that debt collectors "may not use any false, deceptive, or misleading representations or means in connection with the collection of any debt." The enumeration of prohibited collection activities in paragraphs (1)-(16) are not intended to be exclusive ("without limiting the general application of the foregoing...."). Paragraph 1692e(11) exempts pleadings from the specific and limited requirements of *"this paragraph"* (emphasis added). "This paragraph" means just what it says – paragraph e(11). "This paragraph" does not mean §1692e, nor the FDCPA in its entirety. Similarly, §1692g(d) (enacted in 2006) exempts pleadings from the specific, limited, and clearly delineated validation notice requirements of §1692g(a). Both of these specific exemptions would be meaningless if the FDCPA did not apply to litigation.

Defendant's argument is also belied by Congress' repeal in 1986 of the exemption that had previously existed for attorneys. In repealing the exemption, Congress rejected arguments that existing mechanisms for curbing lawyers' misbehavior were adequate and that application of the FDCPA to litigation would be burdensome. On the contrary, Congress expressly found that "current law does not adequately protect consumers from attorney debt collection abuses and that repeal of the attorney exemption the Fair Debt Collection Practices Act is an appropriate way to reduce the amount of this abuse." H. Rep. 405 at 7, reprinted in 1986 U.S.C.C.A.N. at 1758.

Of the other cases cited by North Star, *Wade* holds that sending an "innocuous" collection letter which did not threaten litigation, without being licensed as required under state law, is not a *per se* violation of the FDCPA. *Wade*, 85 F.3d at 1100. Other courts hold that *Wade* depends on the innocuous nature of the communication, and that threatening or filing unauthorized lawsuits does violate the FDCPA, *Goins v. JBC & Assocs., P.C.*, 352 F. Supp. 2d 262 (D.Conn. 2005), or completely disagree. *U.S. v. Nat'l Fin. Servs., Inc.*, 820 F.Supp. 228, 235-36 (D. Md. 1993), *aff'd*, 98 F.3d 131 (4th Cir. 1996); *Sibley v. Firstcollect, Inc.*, 913 F. Supp. 469 (M.D.La. 1995); *Russey v. Rankin*, 911 F.Supp. 1449 (D.N.M. 1995); *Kuhn v. Account Control Tech., Inc.*, 865 F.Supp. 1443, 1451-1452 (D.Nev. 1994); *In re Belile*, 209 B.R. 658 (Bankr. E.D. Pa. 1997); *Rosa v. Gaynor*, 784 F.Supp. 1, 4-5 (D.Conn. 1989); and *Gaetano v. Payco of Wis., Inc.*, 774 F.Supp. 1404, 1413-1414 (D.Conn. 1990).

*Olvera* is similarly inapposite. *Olvera* merely holds that an assignee of a debt does not violate the FDCPA by charging an interest rate in excess of the statutory ceiling so long as the debt's assignor was licensed to exceed the statutory ceiling. *Olvera*, 431 F.3d at 287-289. Defendant's attempt to read *Olvera* for the proposition that state law may never be consulted in determining what conduct violates the FDCPA is ill-founded in light of the Seventh Circuit's later express statement in *Evory, supra*, that state law may be so consulted.

## VI.    PLAINTIFF ALLEGES BOTH UNFAIR AND DECEPTIVE ACTS

Defendant claims that plaintiff fails to allege deceptive acts with particularity. However, plaintiff clearly alleges that North Star brought suit without title to the claim sued upon, when it

14

should have known that it did not have a valid claim, and that it did this over 100 times, hoping that the consumers would default.  Bringing suit on claims which are or should be known to be invalid in the hope that debtors will default has long been recognized as both unfair and deceptive.  *Kimber v. Fed. Fin. Corp.*, 668 F.Supp. 1480, 1488 (M.D.Ala. 1987).  Indeed, defense counsel themselves assert that purporting to sell debts without legal title is fraudulent and unfair from the standpoint of the debt buyer "purchaser" [Exhibit K];  *a fortiori* it is fraudulent and unfair to the victimized consumer.

Finally, neither FDCPA claims nor ICFA "unfairness"  claims are subject to Fed.R.Civ.P. 9(b).  *Windy City Metal Fabs. & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.,* 2008 U.S. App. LEXIS 16428 (7th Cir. Aug. 1, 2008), *Prophet v. Myers*, 2008 U.S. Dist. LEXIS 44143 (S.D.Tex., June 4, 2008); *Jones. v. Select Portfolio Serv.*, 2008 U.S. Dist. LEXIS 33284 (E.D.Pa., April 23, 2008); *Harris v. River View Ford, Inc.*, 2001 U.S.Dist. LEXIS 15714, *11 (N.D.Ill. Sept. 28, 2001); *Sotelo v. DirectRevenue, LLC*, 384 F.Supp.2d 1219, 1233  (N.D.Ill. 2005); *Strohmaier v. Yemm Chevrolet*, 211 F.Supp.2d 1036, 1043-44 (N.D.Ill. 2001); *Gaddy v. Galarza Motor Sport, Ltd.*, 2002 U.S.Dist. LEXIS 13881 (N.D.Ill., 2000).

## VII.  PLAINTIFF ALLEGES ACTUAL DAMAGES

Defendant's claim that plaintiff has not alleged actual damages is false.  The filing of a collection suit without title to the debt is necessarily injurious. Mr. Washington was required to retain counsel to defend it.

## VIII.  CONCLUSION

For the reasons stated, defendant's motion to dismiss should be denied.

Respectfully submitted,

/s/ Thomas E. Soule
Thomas E. Soule

Daniel A. Edelman
Thomas E. Soule
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

15

## CERTIFICATE OF SERVICE

I, Thomas E. Soule hereby certify that on August 12, 2008, the preceding document was filed with the Court and served upon the following individuals by operation of the Court's electronic filing system:

David M. Schultz
dschultz@hinshawlaw.com
courtfiling@hinshawlaw.com

Corinne C. Heggie
cheggie@hinshawlaw.com

/s/ Thomas E. Soule
Thomas E. Soule

## LIST OF EXHIBITS

A.    Sept. 17, 2007 press release by Atty. Gen. Madigan regarding ICAA amendment

B.    C. Petry, "Do your homework; Dangers often lay hidden in secondary market debt portfolio offerings;" *Collections & Credit Risk*, March 2007

C.    Opinion in *RMB Holdings LLC v. Goldberg & Assocs. LLC*, Case No. 3:07CV406 (E.D.Tenn.), Docket No. 24

D.    Excerpt from *Collections & Credit Risk*, April 2008

E.    FTC press release of Dec. 8, 2004 regarding actions against CAMCO

F.    Complaint in *People v. Arrow Fin. Servs. LLC*, Case No. 07CH2475 (Cook Co. Cir. Ct.)

G.    Redline version of amendment to ICAA

H.    Transcript of Illinois House of Representatives debate of May 30, 2007 on ICAA amendment

I.    Complaint in *North Star Capital Acquisition LLC v. Washington*, 2008 M1 123089 (Cook Co. Cir. Ct.)

J.    Transcript of hearing in *Unifund v. Cox*, 08 AR 22 (DuPage Co. Cir. Ct. April 11, 2008)

K.    Complaint in *Hudson & Keyse, LLC v. Goldberg & Assoc., LLC*, 07-81047 (S.D.Fla.)



ILLINOIS ATTORNEY GENERAL LISA MADIGAN

**PRESS RELEASE**

www.IllinoisAttorneyGeneral.gov

**For Immediate Release**
**September 17, 2007**

Contact: Robyn Ziegler
312-814-3118
877-844-5461 (TTY)
rziegler@atg.state.il.us

## MADIGAN: CHANGES IN ILLINOIS COLLECTIONS LAW WILL PROTECT BORROWERS AND ID THEFT VICTIMS

Chicago —Attorney General Lisa Madigan today announced that a recently enacted law will afford Illinois consumers greater protections from abusive debt collection practices.

Drafted by Madigan's office and sponsored by State Senator Don Harmon ( D-Oak Park ) and State Representative Marlow H. Colvin (D-Chicago), the Illinois Fair Debt Collection Practices Act (P.A. 95-0437) will ensure that consumers receive the same level of protection under state law as they receive under federal debt collection laws.

Madigan proposed the legislation after debt collection complaints filed with her office jumped more than 65 percent in 2006 from the previous year to a total of 2,210.

Debt collection complaints are on the rise nationwide. According to the National Association of Attorneys General (NAAG), debt collection complaints was the second most common type of consumer complaint filed with state attorneys general in 2006, up from eighth in 2005.

"The complaints filed with my Consumer Fraud Bureau tell a story of an industry that engages in abusive tactics and pursues consumers even when shown they have the wrong person, a victim of identity theft, or the debt has been paid or settled," Madigan said.

Madigan is especially concerned that some debt collectors are pressuring consumers into paying off debts that they do not legally owe. In 2006, 210 complaints to her office concerned collection agencies that were demanding payment of debts that turned out to be the result of identity theft.

"These consumers were effectively victimized twice," Madigan said, "first by the identity thief, then by the collections agency." In response to this problem, the new law requires collectors to suspend collection activities and investigate when a consumer notifies them that a debt is the result of identity theft. If the investigation confirms that the consumer does not owe the debt, the collector must permanently stop collection activities and notify the credit bureaus to



remove any adverse information relating to the debt from the consumer's file.

"There are many debt collection agencies that intentionally harass consumers," Colvin said. "This new law provides greater protection to those in debt and will reduce the number of instances where aggressive collectors needlessly harass debtors."

In addition to creating a dispute procedure for victims of identity theft, the new law updates Illinois law so that it more closely resembles the Federal Fair Debt and Collections Practices Act. Specifically, the Act harmonizes state law with federal law by:

- providing that a debt collector must validate the debt upon request of the consumer,
- requiring the debt collector to cease communication upon the consumer's written request, and
- expanding the definition of "debt collector" to include the rapidly growing number of debt buyers in the industry.

"This legislation clarifies what is acceptable debt collection practice," Harmon said. "It eliminates any potential conflicts with federal regulation, protects consumers from unreasonable and unfair collection methods, and gives relief to those who may have been victimized by identity theft. I think it's a benefit to both the consumer and the collection agencies."

Madigan noted that consumer advocates attribute the rise in debt collection complaints to a number of factors. These factors include the explosive growth of the debt buyer industry in recent years and the rise in consumer debt. Debt buyers, some of whom collect old debt that they purchase for pennies on the dollar, file cases by the thousands in overworked courts and sometimes fail to keep track of critical information, such as proof of the original debt and payment records. Debt buyers have not been covered under existing state law until now.

The new law also gives the Attorney General authority to enforce its key provisions—authority the agency will share with the Illinois Department of Financial and Professional Regulation.

The law, which was signed by the governor on August 27, will take effect January 1, 2008.

-30-

Return to September 2007 Press Releases

Do Your Homework; Dangers often lay hidden in secondary market debt port

1 of 1 DOCUMENT

Copyright 2007 SourceMedia, Inc.
All Rights Reserved
Collections & Credit Risk

**March 2007**

SECTION: DEBT BUYING; Pg. 24 Vol. 12 No. 3

LENGTH: 2093  words

HEADLINE: Do Your Homework;
Dangers often lay hidden in secondary market debt portfolio offerings. Here are lessons from the market pros that novices can use to avoid nasty surprises.

BYLINE: Corinna C. Petry

BODY:

More collection agencies are turning to the debt resale market as a place to pick up accounts to collect on. Too small to buy portfolios directly from major credit issuers, they look to the secondary market where portfolios are resold in smaller chunks that they can handle.

But what they sometimes find in the secondary market are horror stories: The same portfolio is sold to multiple buyers; the seller doesn't actually own the portfolio put up for sale; half the accounts are out of statute; accounts are rife with erroneous information; access to documentation is limited or nonexistent.

Any of these scenarios can lead to losses, or at least tremendous aggravation, before getting the problems resolved.

Those who don't want to face such horrors needs to do their homework thoroughly and repeatedly for each deal, experts say. Key steps to take include checking the reputation and history of every seller you deal with, tracking chain of title, evaluating data comprehensively, protecting consumers' privacy and inserting favorable terms in a sales contract.

And be aware that new bankruptcy rules have changed debtor behavior. If your pricing and recovery models don't reflect such changes, you could get burned even when you think you've completed all your other due diligence.

"Our worst nightmare occurred when we purchased a portfolio from a California seller" in 2005, recalls Brian S. Glass, director of acquisitions for Streamline Capital Partners, a debt purchaser in Lincolnwood, Ill. "Once we saw the unmasked file, our consultant arranged the file in balance order and found that the last payment and charge-off dates were in the same order, so we knew the data had been manipulated."

The company learned too late that this seller had set up a series of shell corporations, operating under fictitious names, all to avoid state and federal prosecution.

Streamline succeeded in returning a third of the portfolio to the seller, which turned around and resold it elsewhere. But "we are litigating against the seller," and its officers, claiming breach of contract, fraud and unjust enrichment, Glass says.

"As the market matures, a lot of opportunists have joined in," Glass warns, so many buyers like Streamline have "developed better systems for performing due diligence."

The good news was that Streamline did make money on the portfolio.

To resolve the data manipulation problem, the company ran credit reports on every account and corrected all the bad data on last payment and charge-off dates, Glass explains. "With specific account information like this, it is much easier to substantiate the account to a debtor who may not have been contacted in several years," he says.

Glass isn't the only one with unsavory stories about secondary sales.



Do Your Homework; Dangers often lay hidden in secondary market debt port

"When I started, there was a high probability that the seller didn't really own the portfolio he was selling," recalls debt market veteran Gary Wood, president of Collins Financial Services Inc., Austin, Texas. "We've even had potential buyers try to sell our own portfolio back to us."

Wood echoes Glass, saying it's best "to know the company you're buying from, their history and their standards. It should be someone you've done business with before," or a member of a professional trade group, such as the Debt Buyers Association International (chaired by Wood) or National Association of Retail Collection Attorneys.

Most industry participants today are "pretty trustworthy," Wood says. Only a few have misrepresented portfolios they have for sale, yet to prevent messes, "we have all become very sophisticated with the software that receives files, sorts and scrubs them."

Scrubbing files identifies accounts that cannot be collected on, such as deceased or bankrupt debtors.

Caveat Emptor

"Beware of anyone who says, 'I'm going to do you a favor,'" says Raymond P. Bell Jr., vice president of Creditors Interchange Receivables Management LLC, Abington, Pa. Involved in banking and credit card debt sales since 1967, Bell has long experience and has seen dealmakers try to pull a fast one.

Creditors Interchange services accounts for buyers of bad debt and provides portfolio evaluation and consulting services. "I generate revenue for people who buy in the secondary market," Bell explains.

His primary advice to buyers is to make sure their revenue projection models reflect actual conditions, even to the nation's economic health and, right now, to pay attention to the pent-up demand for access to bankruptcy court.

Bell believes buyers in the secondary market should not have the same expectations of recovery as they did before the bankruptcy law was changed. True, fewer debtors are filing but that doesn't mean they are more able to pay.

Collectors may have to work twice as hard to get half the monthly payment amount from a debtor who is, for various reasons, unable to file, Bell explains. This trend affects both revenues and costs for the collector.

In addition, most models do not account for credit reports in files for which fresh reporting hasn't been gathered in years. Old information - from negative incidents to the consumer's past wages - lives on from buyer to buyer.

"What I see in pricing secondary-market paper is that the predictions on returns are not up to date," Bell says.

Bell also recommends buyers do more research about the portfolio and compare its virtues with external data to avoid flawed conclusions. For example, a portfolio buyer who sees most of the accounts are in Pennsylvania might be glad to learn the state's mean household income is $41,000. Yet 68% of the population makes less than $30,000.

"That will skew how well you can recover. If a buyer is adept at small balances, this portfolio might be a good buy," Bell says, because it's easier to collect $10 than $100 a month from a debtor with modest income.

Protective Measures

"We have had three or four deals over the years that bit us," says Vernon Fuller, senior vice president of risk at Genesis Financial Solutions, Beaver-ton, Ore. "Two areas where we've had problems were in the medical space, and with portfolios that went through many different hands."

With medical debt, the problem starts with inadequate accounting systems at the healthcare provider, systems that may not be current on whether the patient or insurer already paid the bill, or that may unintentionally overbill or double bill a patient.

The buyer has to assert, in the representations and warrants of the purchase and sales contract, the right to return those accounts that are not collectible for the above reasons.

With problem portfolios, Fuller says, "You don't want to prove every balance is inaccurate," but if preliminary research shows a significant percentage are, "you want to put the whole portfolio back. You don't want to spend more money to show the portfolio is flawed or take legal risks by trying to collect erroneous balances."

A buyer can safeguard himself by placing the purchase price in escrow and work 5% of the account to see if there are any problems with balances or disputes. The buyer can also offer to work the portfolio on a contingency basis for several months, and when satisfied, finalize the deal, he explains.

Do Your Homework; Dangers often lay hidden in secondary market debt port

Fuller concedes that sellers and resellers may be reluctant to participate in either type of arrangement but it would benefit them if they're not confident of data quality, and if the buyer will guarantee the price should the files prove to be clean.

### Titles, Bills of Sale, Media

"I once was in a deal where I sold paper to people that sold and resold the debt, resulting in dual collections. The litigation is still going on," says Michael Taulbee, managing director of acquisitions and sales for Houston Funding ll Ltd. and the author of a chapter on debt buying pitfalls in the Debt Buying Handbook, to be published this spring by ACA International.

He stresses that a chain of title to a portfolio must show the actual bills of sale between buyers and sellers, proving a company actually owns the debt.

"I want a clean chain of title and know who the previous buyers are," remarks Fuller at Genesis Financial.

"Track the title to the originator," Glass at Streamline agrees. "If there have been three owners, there should be three bills of sale."

One unpleasant surprise may occur when a seller misrepresents facts regarding the availability of backup documents, which the industry calls media.

Among the questions a buyer should ask when evaluating a portfolio, according to Wood, are: What percent of media are available? Is any provided free? How much is being charged for media? How much time does the buyer have to order media?

Another worry is that the media promised by the seller is not delivered but "they never promise you'll get it all," Wood says. Contracts typically only specify that the seller will deliver media "to the extent that it is reasonably available." So it's a promise to try, not to deliver. The availability factor "is a risk that everybody takes," Wood remarks.

As the banking industry has consolidated, much documentation for older portfolios has been lost. "Not all files get picked up by an acquirer so the information is gone," he notes.

A broker warns that original creditors typically agree to provide media for a limited time.

"If you buy a resold portfolio, the documentation availability from the bank may be expired," explains Sean McVity, managing partner for Garnet Capital Advisors, New York, because the bank doesn't want to do that work years later. However, "you can get media that the reseller already owns or is willing to dig up for you," he says.

Backup documents are needed on accounts that will be litigated. "The easiest thing for a debtor to do is to claim he does not owe the debt. So if you have a credit application, it's proof," McVity says, proof that also satisfies a judge.

### What's the Deal?

Once a buyer trusts the seller, has established the chain of title, has the bills of sale, and media, and has written a contract to protect his interests, what else can go awry?

A great deal. And this is where proper analysis comes in.

According to McVity, a buyer should know what collection terms the previous collector has negotiated with debtors.

Many offer to collect much less than the payoff balance if the debtor shows a good payment history on the debt. Yet the seller may not have changed the accounting system to reflect the settlement until the debt is satisfied. So the portfolio may be worth much less than the combined payoff balances of the accounts involved because some already have been paid at a reduced amount.

When Garnet evaluates a portfolio, "we dig into the reseller's drawers to check settlement deals and payment arrangements," says McVity.

Streamline Capital sends files it wants to acquire out for independent analysis and scoring, especially to home in on desired demographics.

The firm also uses stratification software to mine for the attributes it wants.

Do Your Homework; Dangers often lay hidden in secondary market debt port

For example, such software can highlight all accounts with balances exceeding $10,000 and compare it with Social Security numbers to determine the average age of high-balance account holders. A buyer wants to avoid elderly debtors with high balances because their fixed, and often low, incomes make them difficult to collect on, Glass explains.

Stratification software can also reveal data manipulation by someone up the chain of title, he notes.

In evaluating a portfolio, Streamline uses a checklist of 30 items, "just like you would in a commercial real estate transaction," Glass says, and every single item must be checked off before the transaction is approved.

McVity, Glass and others agree that one of the most important measures to avoid a bad deal is to know what you want. Many buyers, like Streamline, have a niche and have learned what works and doesn't work for them, and so they pursue deals more selectively, and effectively.

According to Wood, the experienced hands have refined their analysis so well that they can offer a bid in a day or two.

Taulbee recommends buyers "be very careful. Perform the due diligence - thoroughly, every single time, even when buying from a friend you trust. Don't go outside the normal routine or you will get burned."

The overall guide for new and experienced debt buyers is the same, sums up Susiver Flandez, CEO of Vortex Financial Asset Management, which buys and sells credit card portfolios. Debt buyers who stumble into pitfalls do so "because they don't do their homework," he says. Better to take the time to do that homework than to rush into a raw deal.

http://www.creditcollectionsworld.com http://www.sourcemedia.com

**LOAD-DATE:** March 1, 2007

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

RMB HOLDINGS, LLC,                    )
                                      )
              Plaintiff,              )
                                      )
v.                                    )        No. 3:07-cv-406
                                      )        (SHIRLEY)
GOLDBERG & ASSOCIATES, LLC            )
                                      )
              Defendant.              )

<u>**MEMORANDUM AND ORDER**</u>

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal

Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry

of judgment [Doc. 7]. On May 13, 2008, the parties appeared before the Court for a hearing on the

following motions filed by Plaintiff: Motion for Summary Judgment [Doc. 10]; Motion to Compel

or to Extend Deadline to File Motion to Compel [Doc. 13]; Motion to Extend Discovery Deadline

for Purposes of Depositions Pending Motion for Summary Judgment [Doc. 14]; and Motion to

Extend Deadline to File Plaintiff's Final Witness List [Doc. 16]. Attorney Thomas Dickenson

appeared on behalf of Plaintiff. Attorney Tamara Klopenstein appeared on behalf of Defendant.

At the hearing, Mr. Dickenson advised the Court it was his client's position that oral argument

would only be necessary on the pending motion for summary judgment, and with the Court's

permission, he would only proceed on that motion. Mr. Dickenson further advised the Court that

it is Plaintiff's position that the other pending discovery related motions are intertwined with the

summary judgment motion and based on the Court's ruling, those motions will either become moot

or can be decided based on the pleadings. Defendant had no objection to Plaintiff's contention.

Accordingly, the Court proceeded with oral argument on Plaintiff's Motion for Summary Judgment.



## I.    Relevant Facts

As the Court is required to do in reviewing a motion for summary judgment, all facts will be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Plaintiff RMB Holdings ("RMB") is a Georgia limited liability company with its principle place of business located in Knoxville, Tennessee [Doc. 1 at ¶ 1]. Defendant Goldberg and Associates ("Goldberg") is a Florida limited liability company, with its principle place of business located in Boca Raton, Florida [Id. at ¶ 2]. Both RMB and Goldberg are in the business of buying, selling, and/or collecting on consumer debt [Doc. 11 at 6]. On or about August 22, 2007, RMB and Goldberg entered into an Account Purchase and Sale Agreement ("agreement"), in which Goldberg agreed to sell approximately 6,521 accounts ("accounts") to RMB for a purchase price in the amount of $1,662,596 [Id. at ¶ 5]. Goldberg's representative, Steven Goldberg, participated in the negotiations with RMB, had authority to enter into the agreement on behalf of Goldberg, and signed the agreement on behalf of Goldberg [Doc. 10-2 at ¶¶ 1,2; Doc. 17 at 4]. Pursuant to Paragraph 4.B of the agreement, Goldberg incorrectly represented to RMB that it would be the "owner of all right, title and interest in and to all of the Accounts," by the closing date as defined in the agreement and would provide RMB "full and complete chain of title for the portfolio" [Id. at ¶ 6; Doc. 17 at 1]. Goldberg, pursuant to the agreement, also executed a Bill of Sale and Assignment of Non-Performing Loans and Contracts Rights ("Bill of Sale"), and conveyed the accounts to RMB [Id. at ¶ 7]. Goldberg's representative, Steven Goldberg, had authority to enter into the Bill of Sale on behalf of Goldberg and signed the Bill of Sale on behalf of Goldberg [Doc. 10-2 at ¶ 4]. Based upon

2

Goldberg's representations that it owned and had title to the accounts, RMB entered into the transaction to purchase the accounts from Goldberg [Doc. 11 at 7].

Prior to executing the agreement with RMB, Goldberg agreed to purchase accounts from Hudson and Keyse, LLC ("Hudson & Keyse") [Doc. 17 at 4; Doc. 18 at ¶ 8]. Some , if not all, of the accounts that were to be purchased by Goldberg from Hudson & Keyse were later to be sold to RMB pursuant to their agreement with Goldberg [Doc. 18 at ¶ 8]. Goldberg never paid Hudson & Keyse for the accounts it planned to purchase [Doc. 10-2 at ¶ 7]. The agreement between Goldberg and Hudson & Keyse was never fully executed because of a "financial issue" suffered by Hudson & Keyse [Doc. 17 at 4; Doc. 18 at ¶ 8].

RMB paid Goldberg the agreed upon purchase price of $1,662,596 and paid a broker fee of $30,941.24 [Doc. 11 at 8]. Goldberg never delivered title or ownership of the accounts to RMB [Doc. 10-3 at ¶ 10]. When RMB began making attempts to collects the accounts it purchased from Goldberg, it was unable to do so [Doc. 1 at ¶ 9]. Goldberg has failed to refund or repay any of the $1,662,596 to RMB [Doc. 10-2 at ¶ 9]. RMB also lost $43,076.82 in profits from a resale agreement and lost a $8,615.36 broker fee in connection with the resale agreement [Doc. 10-3 at ¶ ¶ 14, 15]. RMB further had to pay $ 3,941.00 in letter expenses (postage and related expenses to collect accounts prior to discovering that RMB never obtained title to the accounts) [Doc. 10-3 at ¶ 16].

## II.   Procedural Posture

RMB moved for summary judgment against Goldberg on April 11, 2008 [Doc. 10]. On May 1, 2008, Goldberg responded [Doc. 17] in opposition to RMB's motion. On May 9, 2008, RMB

filed their reply [Doc. 20]. The parties argued their pleadings on May 13, 2008. Accordingly, this matter is now ripe for adjudication.

### A.    *RMB's Motion for Summary Judgment*

RMB moves for summary judgment as to the following claims: (1) Goldberg's breach of contract and warranty of title; (2) Goldberg's negligent misrepresentation that it was the holder and owner of the accounts that were the subject of the agreement; (3) intentional misrepresentation that it was the holder and owner of the accounts that were the subject of the agreement; and (4) violation of the Tennessee Consumer Protection Act, TENN. CODE ANN. § 47-18-104 since Goldberg falsely represented that it owned or had title to the accounts, which mislead and deceived RMB as to a material fact in the transaction completed by the parties [Doc. 11]. RMB requests rescission of the contract, return of the total purchase price of $1,662,596, lost broker fee of $30,941.24, lost profits of $43,076.82, lost broker fee from resale agreement of $8,615.36, and letter expenses of $3,941.00, totaling $1,833,571.88 plus pre- and post-judgment interest, which accrues at the rate of $326.44 per day [Doc. 10-3 at 2-3]. RMB also claims Goldberg's violation of the Tennessee Consumer Protection Act ("TCPA") entitles it to an award of attorney's fees and costs. RMB also requests punitive damages under its common law intentional misrepresentation claim and statutory treble damages under the TCPA in the amount of $5,500,715.64.[1]

---

[1]RMB recognizes it is entitled to pursue punitive damages under its common law intentional misrepresentation claim and treble damages pursuant to the TCPA, but cannot recover both punitive and treble damages if this Court finds Goldberg liable under both claims. [See Doc. 11 at 20-21]. RMB further advises the Court that it is not in a position to offer proof on punitive damages at this time since discovery has not been completed, but it requests this Court enter an Order reflecting entitlement to punitive damages [Id. at 21].

As a threshold matter, RMB submits this Court should apply the substantive law of Tennessee in adjudicating this matter [Doc. 11 at 2]. The Court finds RMB is correct that a "Federal District Court sitting in diversity is obliged to apply the substantive law of the forum in which it sits" and when jurisdiction is based on diversity, the court "must apply the choice of law rules of the forum state." [Doc. 11 at 2] (citations omitted). Accordingly, it is correctly submitted that Tennessee's choice of law principles apply. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941); Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).

As to RMB's breach of contract and breach of warranty of title claims, under Tennessee law, the rule of *lex loci contractus* applies, which "provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent." Messer Griesheim Industries, Inc. v. Cryotech of Kingsport, Inc., 131 S.W.3d 457, 474-75 (Tenn. Ct. App. 2003) (citing Ohio Cas. Ins. Co. v. Travelers Indem. Co., 493 S.W.2d 465, 467 (Tenn. 1973)). "If the parties manifest an intent to instead apply the laws of another jurisdiction, then that intent will be honored provided certain requirements are met" Id. In this case, the agreement entered into between RMB and Goldberg provides that "[t]his Agreement is made pursuant to, and shall be construed under the laws of Florida." [Doc. 1, Ex. A at 14]. Accordingly, Florida law governs RMB's claims arising from the agreement.

As to RMB's negligent misrepresentation and intentional misrepresentation claims, if there is "no real conflict between or among the relevant laws of the various states", then a choice of law analysis is "unnecessary". Gov't Employees Ins. Co. v. Bloodworth, 2007 WL 1966022, *29 (Tenn. Ct. App. June 29, 2007). "In fact, a conflict between the laws of the states at issue is a necessary predicate to deciding which state's (or states') laws should govern the various issues presented in

the case." Id. (citing Hataway v. McKinley, 830 S.W.2d 53, 55 (Tenn. 1992)). "A court need not make a choice of law if, in fact, there is no real difference or conflict between the relevant laws of the states involved" and may apply the law of the forum Id. RMB contends, and this Court agrees, that Tennessee and Florida law is substantially the same in regard to these two tort claims. Accordingly, this Court will apply Tennessee law in adjudicating the negligent misrepresentation and intentional misrepresentation claims.

**B.**    *Goldberg's Opposition to RMB's Motion for Summary Judgment*

Goldberg replied by filing a Memorandum in Opposition to RMB's Motion for Summary Judgment [Doc. 17]. Goldberg also filed an affidavit signed by Steven Goldberg in support of its opposition to RMB's motion [Doc. 18].

As to RMB's intentional misrepresentation claim, Goldberg contends RMB does not list a cause of action for intentional misrepresentation, but instead, lists a cause of action for fraud, and therefore, treats RMB's intentional misrepresentation claim as one for fraud. Goldberg does not deny the fact that it "incorrectly represented to Plaintiff that Defendant had ownership and title to the accounts that were to be the subject of the transaction" nor does it "dispute the fact that the false representation was material" [Doc. 17 at 1]. Goldberg, however, argues there remains a genuine issue of material fact: whether it "knowingly, intentionally, or with reckless disregard for the truth, misrepresented [its] ownership or title to the accounts in question." [Id.].

As to RMB's claim for treble damages under the TCPA, Goldberg contends RMB again failed to satisfy its burden of proof in showing that it willfully and knowingly violated the TCPA. Goldberg contends it did not intentionally or knowingly misrepresent facts to RMB, but believed it had ownership and title to the accounts in question.

6

C.    *RMB's Response to Goldberg's Opposition to its Motion for Summary Judgment*

In their reply [Doc. 20], RMB first argues it is entitled to summary judgment on all unopposed claims and compensatory damages. RMB contends that since Goldberg only opposes liability under its claims for intentional misrepresentation[2] and treble damages for a knowing and willful violation of the TCPA, it is entitled to summary judgment on its claims of breach of contract and warranty of title, negligent misrepresentation, and a violation of the TCPA as well as for the amount of compensatory damages set forth in the Affidavit of Steven Harb [Doc. 10-3]. Therefore, RMB submits the following issues are the only ones before the Court for consideration: (1) whether Goldberg made the false representations of title and ownership knowing they were false, without belief in their truth, or recklessly with regard to their truth; (2) whether RMB knowingly or willfully violated the TCPA, entitling RMB to treble damages; (3) whether RMB is entitled to punitive damages pursuant to its common law intentional misrepresentation claim, and if so, what amount; and (4) whether RMB is entitled to attorneys fees and costs pursuant to Goldberg's violation of the TCPA, and if so, what amount.

RMB first argues the Court should not consider the affidavit submitted by Steven Goldberg in support of Goldberg's opposition to summary judgment by way of estoppel or waiver since through its conduct, Goldberg has been less than forthright with RMB and the Court. RMB contends Mr. Goldberg's affidavit should not be considered by this Court since Goldberg failed to

---

[2]RMB responds to Goldberg's contention that it failed to list a cause of action for intentional misrepresentation, and instead listed a cause of action for fraud by advising the Court that under Tennessee law, fraud and intentional misrepresentation are "two interchangeable labels for the same conduct" [Doc. 20 at 1 n.1]. The Court has reviewed the cases cited by RMB and agrees with its assessment. Accordingly, the Court will refer to RMB's claim as one alleging intentional misrepresentation.

timely respond to their first request for interrogatories, as required by Fed.R.Civ.P. 33[3] and failed

to provide any documents in response to their February 29, 2008 request for production of

documents, in which RMB sought Goldberg's tax returns for the last three years and the minutes of

Goldberg's meetings of managers, members, and/or board. RMB contends Goldberg's failure to

respond to both of their discovery requests "are a continuing example of gamesmanship and delay

tactics" which have prevented meaningful discovery and caused it to file various motions to compel

with the Court [Doc. 20 at 3]. RMB also submits that Goldberg has further contributed to the delay

of this matter by unequivocally denying RMB's allegations in answering their complaint, but then

admitting the same allegations in RMB's first request for admissions.

     RMB further contends the affidavit submitted by Goldberg is self-serving and does not create

a genuine issue of material fact since the affidavit is devoid of any objective facts that could support

Mr. Goldberg's assertion that he believed he owned the accounts which were the subject of the

agreement between RMB and Goldberg. RMB argues Goldberg failed to produce any documents

which would support Mr. Goldberg's belief as to ownership, and his assertion of belief is not enough

to deny RMB's motion for summary judgment.

     Finally, RMB argues Mr. Goldberg's affidavit was presented in bad faith and for the

purposes of delay, which entitles RMB to an award of reasonable expenses and/or attorney's fees

incurred in responding to Goldberg's opposition. Citing Fed.R.Civ.P. 56(g) and a Tennessee Court

---

[3]RMB advises the Court that Goldberg failed to respond to their interrogatories for over two months, and when it finally did, the responses were produced only three business days before the motion hearing date.

of Appeals decision considering the definition of the term "bad faith"[4], RMB contends the unsupported assertions contained in the affidavit "constitutes a design and plan to mislead Plaintiff and the Court," and "is in furtherance of Defendant's course of conduct in delaying a final resolution of the underlying dispute" [Doc. 20 at 9-10].

### D.    *Arguments Presented at Hearing*

At the hearing, the parties largely reiterated the arguments submitted in their pleadings. A brief summary of their arguments follows.

As a threshold matter, the Court asked defense counsel whether their client, in failing to respond to the following claims: breach of contract and warranty of title, negligent misrepresentation, and liability under the TCPA, was conceding that awarding summary judgment in favor of RMB as to those claims would be proper. Defense counsel agreed Goldberg was not contesting liability under those claims and conceded the TCPA applies to this matter, but is contesting RMB's allegation that it is entitled to treble damages under the statute.

RMB argues the main issue left for adjudication is whether Mr. Goldberg made representations in regard to the accounts, which were the subject of the agreement, knowing those representations were false, or without belief in its truth, or with reckless disregard to its truth, thus, giving rise to liability for an intentional misrepresentation, and whether Goldberg's misrepresentations to RMB constituted a knowing violation of the TCPA, entitling it to an award

---

[4]RMB acknowledges that the cited Tennessee Court of Appeals decision, Banks v. Sanford, No. W2006-00703-COA-R3-CV, at *3 (Tenn. Ct. App. May 3, 2007) discusses Rule 56(g) of the Tennessee Rules of Civil Procedure and furthermore, is not binding authority on this Court. However, RMB cites to the case for the purpose of providing the Court with a definition of "bad faith" and further highlights that the language of Rule 56(g) under the Tennessee Rules of Civil Procedure is the same as Rule 56(g) under the Federal Rules.

of treble damages. Under the TCPA, the term "knowing" or "knowingly" is defined as "actual awareness of the falsity of deception, but actual awareness may be inferred where objective manifestations indicate that a reasonable person would have known or would have reason to know of the falsity or deception" TENN. CODE ANN. § 103(6). RMB contends although there is a difference in the two standards outlined in the causes of action, there is no distinction.

RMB repeated its position with respect to Steven Goldberg's affidavit, and requested the Court not consider it since Goldberg failed to respond to timely discovery requests. In the alternative, RMB argued, if the Court was inclined to consider Mr. Goldberg's affidavit, the affidavit still does not create a genuine issue of material fact since it is insufficient and self-serving. RMB contends Mr. Goldberg's alleged belief as to ownership of the accounts is not supported anywhere else in the record, especially in light of his response to their interrogatory, which states Mr. Goldberg is the only person who works for or on behalf of Goldberg, thus he should have known he did not own or have title to the accounts in question [Doc. 20-2 at ¶ 1]. RMB further argues that Goldberg's failure to produce any documents gives rise to the permissive inference that "a party's failure to produce a document capable of shedding light on a material contested issue can give rise to a permissive inference that the missing document would have been unfavorable to the party possessing it." Richardson v. Miller, 44 S.W.3d 1, 27-28 (Tenn. Ct. App. 2000) (citing Tennessee law of Evidence § 401.9, at 99). RMB contends the evidence in the record supports their claim of intentional misrepresentation and their request for treble damages since Goldberg willfully disregarded the truth in their representations to RMB. RMB also repeated its request to find Mr. Goldberg's affidavit was filed in bad faith.

10

As an initial matter, counsel for Goldberg argues that Steven Goldberg's affidavit was not filed in bad faith. Goldberg maintains its lack of knowledge in that it did not own the accounts that were the subject of the agreement between RMB and Goldberg and provided a sworn statement affirming that defense. Goldberg advised the Court that an individual by the name of Anthony Feldman was involved in the financial aspect of the transaction between Goldberg and Hudson & Keyse. Upon questioning by the Court, Goldberg's counsel stated Mr. Goldberg's affidavit is based upon state of mind at the time he executed the agreement with RMB, but did not provide the Court with any information supporting that belief, such as a document transferring ownership from Hudson & Keyse or a contract between the two parties reflecting a purchase of the accounts to be executed at a later date, but before the closing date agreed upon by RMB and Goldberg. Goldberg further informed the Court that it has never paid Hudson & Keyse to gain ownership of the accounts nor has it returned any of the money owed RMB for breaching its contract.

Prior to the conclusion of the hearing, counsel for RMB alleged Mr. Goldberg lied in his interrogatory based on defense counsel's statement at the hearing that an individual named Anthony Feldman was involved in the financial aspect of the deal between Goldberg and Hudson & Keyse. RMB argues this discrepancy between defense counsel's statement and the response given during discovery shows why the Court should not use Mr. Goldberg's affidavit as an indicator of truthfulness. RMB requested the Court review Doc. 20-2, specifically questions one and two. Question one asks for the name and information of any person "who performed any work, or have any knowledge relating to the sale of accounts, promissory notes, and/or evidence of indebtedness between Goldberg and RMB" [Doc. 20-2 at ¶ 1]. Mr. Goldberg's response states he is "the only person who works for or on behalf of the LLC" [Id.]. Question two asks for the name and

11

information of any person, including independent contractors, "who performed any work, or have any knowledge relating to the sale of accounts, promissory notes, and/or evidence of indebtedness between Goldberg and Hudson & Keyse, LLC" [Doc. 20-2 at ¶ 2]. Mr. Goldberg's response again states he is "the only person who works for or on behalf of the LLC" [Id.].

III.   **Standard of Review**

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing there is no genuine issue of material fact lies upon the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Burchett v. Kiefer, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the

non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 332. Accordingly, the judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Id. at 249. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

IV.    **Analysis**

RMB moves for summary judgment as to the following claims: (1) Goldberg's breach of contract and warranty of title; (2) Goldberg's negligent misrepresentation that it was the holder and owner of the accounts that were the subject of the agreement; (3) intentional misrepresentation that it was the holder and owner of the accounts that were the subject of the agreement; and (4) violation of the Tennessee Consumer Protection Act, TENN CODE ANN. § 47-18-104, since Goldberg falsely represented that it owned or had title to the accounts, which mislead and deceived RMB as to a material fact in the transaction completed by the parties [Doc. 11]. Each of these issues will be discussed in turn.

A.    *Breach of Contract and Warranty of Title*

RMB asserts a claim of breach of contract and warranty of title and argues it is entitled to summary judgment on this claim because Goldberg failed to perform its obligations pursuant to the

13

agreement and breached the warranties and representations made in both the agreement and bill of sale [Doc. 9]. Goldberg concedes it breached its contract with RMB as well as the warranties and representations made in the agreement and bill of sale. Accordingly, RMB's Motion for Summary Judgment on its claims for breach of contract and warranty of title is **GRANTED**.

### B.     *Negligent Misrepresentation*

RMB asserts a claim of negligent misrepresentation, arguing Goldberg: (1) acted in the course of its business, profession, or employment, or in a transaction in which it has a pecuniary interest; (2) supplied faulty information meant to guide others in their business transactions; (3) failed to exercise reasonable care in obtaining or communicating the information; and (4) RMB justifiably relied on the information given to them by Goldberg [Doc. 11 at 11 citing John Martin Co. v. Morse/Diesel, Inc., 819 S.W.2d 428, 431 (Tenn. 1991) for the elements of negligent misrepresentation)]. Goldberg concedes it was acting in the course of its business when it represented it was the owner and holder of the accounts that were the subject of the agreement and that it had a pecuniary interest in the transaction. Goldberg further concedes that its representation was false because it was never the owner or holder of the accounts, that it failed to exercise reasonable case in obtaining information, and that RMB justifiably relied on the false representations. Accordingly, RMB's Motion for Summary Judgment on its claim for negligent misrepresentation is **GRANTED**.

### C.     *Intentional Misrepresentation*

With respect to intentional misrepresentation, RMB alleges Goldberg knew it did not have title or ownership to the accounts, or at least made the false representations in reckless disregard to the truth. To prove a claim for intentional misrepresentation, a plaintiff must show that (1)

14

defendant made a representation of fact; (2) the representation was false; (3) the representation was made either knowingly, recklessly, or without belief in its truth; (4) the plaintiff acted reasonably in relying on the representation; and (5) the plaintiff suffered damages as a result of the representation. City State Bank v. Dean Witter Reynolds, Inc., 948 S.W.2d 729, 738 (Tenn. Ct. App. 1996); see also Axline v. Kutner, 863 S.W.2d 421, 423 (Tenn. Ct. App. 1993). For the purposes of considering RMB's claim, the terms "intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are synonymous. See Concrete Spaces, Inc. v. Sender, 2 S.W.3d 901, 905 n. 1 (Tenn. 1999).

To defeat RMB's motion for summary judgment, Goldberg is required to either affirmatively negate one of the essential elements set out above or conclusively establish an affirmative defense. Blair v. West Town Mall, 130 S.W.3d 761, 768 (Tenn. 2004). In this case, Goldberg does not dispute it "represented to [RMB] that [it] owned and had title to the accounts" nor does Goldberg dispute the representation made during negotiations was false [Doc. 17 at 5]. Goldberg also admits that RMB acted reasonably in relying on its representation and that RMB suffered damages as a result of its misrepresentation [Id.]. Goldberg, though, contends RMB has not provided any evidence that it represented ownership of the accounts at issue with knowledge that it did not actually own the accounts. In support of its contention, Goldberg submitted an affidavit of Steven Goldberg, its managing shareholder, which states "[a]t the time of execution, and all times leading up to the execution of the Agreement and Bill of Sale, [Goldberg] believed that it had ownership and clear title to the Accounts" and that it was not his "intent to misrepresent my ownership of the Accounts" [Doc. 18 at 2]. This Court does not find Goldberg's contention or affidavit in support thereof well taken.

15

The element at issue in this case requires a showing that the misrepresentation was intentional, was made without a belief it was accurate, or was made with reckless disregard for the truth. See Metro. Gov't of Nashville and Davidson County v. McKinney, 852 S.W.2d 233, 237 (Tenn. Ct. App. Sept. 4, 1992). In response to RMB's allegations that it either knew it did not own the accounts in question or it made the representations with reckless disregard to the truth, Goldberg has not presented any "significant probative evidence" demonstrating what would have given it reason to think it was the owner of the accounts that were the subject of the agreement between it and RMB. Moore v. Phillip Morris Co., Inc., 8 F.3d 335, 339-40 (6th Cir. 1993) (internal citations omitted). While Goldberg may use "affidavits or ... depositions, answers to interrogatories, and admissions on file" to "designate specific facts showing that there is a genuine issue for trial," the Court finds in this matter, all Goldberg has shown, at best, is "that there is some metaphysical doubt as to the material facts." Id. Goldberg has failed to point to evidence in the record which "presents a sufficient disagreement to require submission to a jury" to resolve the merits of this claim. Id.

All Goldberg provides in support of its opposition is one person's conclusory statement that he believed Goldberg had ownership of and title to the accounts. Id. While the affidavit is prepared by "the only person who works for or on behalf of [Goldberg]" [Doc. 20-2 at ¶ 1], who is "competent and authorized to testify to the matters stated herein" [Doc. 18 at ¶ 1], the Court finds Steven Goldberg's statement is "rife with self-serving conclusions". Devine v. Jefferson County, Kentucky, 186 F.Supp.2d 742, 743 (6th Cir. 2001). The affidavit contains an abundance of generalizations, but few, if any, facts for a jury to consider. It is well established that affidavits containing "nothing more than ... conclusory allegations and subjective beliefs ... are wholly insufficient evidence" to establish a claim "as a matter of law." Mitchell v. Toledo Hosp., 964 F.2d

16

577, 585 (6th Cir. 1992); see also Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1999) ("Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment.") (citing Kornacki v. Norton Performance Plastics, 956 F.2d 129 (7th Cir. 1992)).[5] The affidavit fails to provide any factual or documentary support for Goldberg's assertion, such as contract between Goldberg and Hudson & Keyse evidencing their independent agreement to buy and sell the accounts which would subsequently be resold by Goldberg to RMB, or any evidence, that supports Steven Goldberg's contention that Goldberg believed Goldberg owned or had title to the accounts. In Tennessee, "a party's failure to produce a document capable to shedding light on a material contested issue can give rise to a permissive inference that the missing document would have been unfavorable to the party possessing it." Richardson v. Miller, 44 S.W..3d 1, 27-28 (Tenn. Ct. App. 2000) (citing Tennessee Law of Evidence § 401.9, at 99) (recognizing "that sometimes the absence of something expected can be significant"). The Court finds Goldberg's failure to produce any additional information in support its belief that it owned the accounts in question is significant and contributes to the finding that the affidavit is self-serving and thus, insufficient to defeat RMB's motion for summary judgment. Furthermore, Steven Goldberg fails to provide any specifics in his affidavit as to the transaction between Goldberg and Hudson & Keyse, which would support his belief that there was "a deal in place ... to purchase the Accounts" [Doc. 18 at ¶ 8]. In light of the lack of information provided, there is simply not enough evidence in the record to create a genuine issue of material fact as to the knowledge element of RMB's intentional misrepresentation claim.

---

[5]This circumstance is not unlike the prohibited practice where a party attempts to create a factual issue to defeat summary judgment by submitting an affidavit that contradicts a prior statement in a deposition. See Jones v. Gen. Motors Corp., 939 F.2d 380, 385 (6th Cir. 1991)

Nor does Steven Goldberg make any effort in his affidavit to explain why Goldberg thought it owned the accounts in question if it never paid Hudson & Keyse pursuant to their agreement [Doc. 10-2 at ¶ 7-8]. Steven Goldberg simply states, with no further elaboration or explanation that "the transaction was never executed because of a financial issue with Hudson & Keyse, ... [which] I have no personal knowledge as to the specifics of Hudson & Keyse's, LLC, financial issue." [Doc. 18 at ¶ 8]. The Court finds it quite disturbing that Goldberg claims Steven Goldberg is "the only person" who would have knowledge about or who worked on the transaction with Hudson & Keyse [Doc. 20-2 at ¶ 2], yet according to his affidavit, he had no knowledge of why the transaction was never executed. As stated at the hearing, the Court is also quite troubled by Goldberg's claim that it thought or "believed" it owned and had title to the accounts, but yet admitted, in discovery and in open court, it never paid Hudson & Keyse for those accounts, had no document transferring ownership, and had nothing to allegedly transfer. Other than reiterating this belief, Goldberg has offered <u>no</u> basis, let along a good faith basis, for such a belief or what the belief was based on [<u>See</u> Doc. 10-2 at ¶ 7]. Again, Goldberg failed to provide any evidence in support of its claim at the hearing that based on past transactions, it believed it owned the accounts without paying Hudson & Keyse for them. Nowhere in Steven Goldberg's affidavit does Goldberg contend that the contract principles of course of dealing or usage of trade apply to support its contention that it believed it had ownership of the accounts even though it had not yet paid for them, nor was it established at the hearing that the contract principles applied.

For all the reasons outlined above and after careful examination of the all the evidence before the Court, the Court concludes no genuine issue of material fact exists as to whether Goldberg intentionally misrepresented to RMB that it was the owner of and had title to the accounts that were

the subject of agreement entered between the two parties on August 22, 2007. The Court concludes Goldberg's misrepresentation in regard to its ownership of the accounts was intentional, was made without a belief it was accurate, or was made with reckless disregard for the truth. Accordingly, RMB's Motion for Summary Judgment as to its intentional misrepresentation claim is **GRANTED**.

### D.    *Tennessee Consumer Protection Act*

Finally, RMB asserts that Goldberg's actions constituted a breach of the TCPA. The TCPA provides for a cause of action when an individual suffers "an ascertainable loss of money or property ... as a result of the use or employment by another person of an unfair or deceptive act or practice ..." TENN. CODE ANN. § 47-19-109(a)(1). RMB alleges that Goldberg's actions, specifically falsely representing that it owned or had title to the accounts, constitute a violation of the TCPA.[6] Goldberg does not contest its liability under the TCPA; it only contests RMB's claim for treble damages, which is discussed below. Accordingly, RMB's Motion for Summary Judgment as to its TCPA claim is **GRANTED**.

### E.    *Damages*

RMB seeks compensatory damages in the amount of $1,833,517.88 plus pre- and post-judgment interest.[7] It further seeks attorney's fees and costs under the TCPA, contending if the Court determines it is entitled to an award of attorney's fees, the exact amount can be determined

---

[6]The TCPA provides a laundry list of specific activities that constitute unfair or deceptive acts or practices. See TENN. CODE ANN. § 47-18-104(b). RMB does not rely on any of those specific provisions, but rather on the statute's catch all provision, which prohibits "any other act or practice which is deceptive to the consumer or to any other person." TENN. CODE ANN. § 47-18-104(b)(27).

[7]RMB contends the amount of interest through April 11, 2008 is $84,398.37 and will continue to accrue thereafter at the rate of $326.44 per day [Doc. 10-3 at 4].

by the Court at a later date upon the filing of a supplemental affidavit [Doc. 11 at 20]. RMB also seeks punitive damages under its common law intentional misrepresentation claim and statutory treble damages pursuant to the TCPA. In regard to its claim for punitive damages, RMB claims it is not in the position to offer proof on punitive damages since the discovery deadline has not passed and discovery is incomplete, thus it is seeking an order reflecting entitlement to punitive damages, but is not seeking a ruling on the amount of punitive damages.[8] In regard to its claim for treble damages under the TCPA, RMB requests damages in the amount of $5,500,715.64.

"It is axiomatic that a plaintiff may not recover double redress for a single wrong." Miller v. United Automax, 166 S.W.3d 692, 697 (Tenn. 2005); see also Concrete Spaces, Inc. v. Sender, 2 S.W.3d 901, 906 (Tenn. 1999); Shahrdar v. Global Housing Inc., 983 S.W.2d 230, 238 (Tenn. Ct. App. 1998) ("Whether the theory of recovery is breach of contract, intentional misrepresentation, or promissory fraud, if the damages claimed under each theory overlap, the Plaintiff is only entitled to one recovery."). If a defendant has been liable under more than one theory of recovery, no inequity results from allowing the plaintiff to choose one of the claims upon which to realize its maximum recovery of enhanced damages. Concrete Spaces, 2 S.W.3d at 909. Therefore, in a case such as this one, where Goldberg was found liable under the theory of intentional misrepresentation and for violations of the TCPA and if the Court finds it is entitled to damages under both claims, RMB must elect either punitive damages under the common law claim or treble damages under the TCPA.

---

[8]RMB filed its Motion for Summary Judgment on April 11, 2008. Trial in this matter is set for June 11, 2008. Per this Court's Scheduling Order [Doc. 8], all discovery shall be completed thirty days before trial.

1.    **Intentional Misrepresentation Claim**

In Tennessee, it is clear that punitive damages are "restrict[ed] ... to cases involving only the most egregious of wrongs." Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 900-01 (Tenn. 1992). A court may "award punitive damages only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." Id.

> A person acts intentionally when it is the person's conscious objective to engage in the conduct or cause the result. ... A person acts fraudulently when (1) the person intentionally misrepresents an existing material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. ... A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

Id. (internal citations omitted).

Punitive damages may only be awarded where the plaintiff has proven that the defendant acted intentionally, fraudulently, maliciously, or recklessly by clear and convincing evidence. Id.

In this matter, the Court finds RMB established, by clear and convincing evidence, that Goldberg made a material and intentional misrepresentation in regard to its ownership of the accounts that were the subject of the agreement between RMB and Goldberg. Goldberg represented it owned the accounts when it did not. Furthermore, its belief that it owned the accounts although it did not exchange any money with Hudson & Keyse to purchase those accounts was a "conscious disregard" of "a substantial risk" which was "a gross deviation from the standard of care that an ordinary person would exercise" in the same circumstances. Hodges, S.W.2d at 900-01. Accordingly, RMB is entitled to punitive damages. RMB is directed within thirty days of the

21

entering of this order to file with the Court information reflecting whether, in light of the Court's granting of treble damages, RMB prefers and seek punitive damages, and if so, the amount of punitive damages it seeks.

### 2. TCPA Claim

Upon finding that the TCPA has been violated, a court is authorized the award the plaintiff reasonable attorney's fees, TENN. CODE ANN. § 47-18-109(e)(1), and further provides that a court "may award three (3) times the actual damages sustained" upon a finding that the defendant's violation of the TCPA was "willful or knowing". Id. at (a)(3). While "willful" is not defined in the TCPA, "knowing" is. It is defined as "... actual awareness of the falsity or deception, but actual awareness may be inferred where objective manifestations indicate that a reasonable person would have known or would have had reason to know of the falsity or deception." TENN. CODE ANN § 47-18-103(6).

The Court finds RMB is entitled to treble damages under the TCPA since Goldberg's misrepresentations as to its ownership of the accounts constituted a willful and knowing violation under the TCPA. As discussed above, it was not reasonable for Goldberg to believe it owned or had title to the accounts since it never paid Hudson & Keyse for the accounts [Doc. 10-2 at ¶ 7]. The Court finds a reasonable person would not represent ownership to a third party during contract negotiations if they neither owned nor had paid for the item they were purporting to sell. Further, Goldberg made such ownership statements with actual awareness of the falsity of the statement, and the deception it would create, and a reasonable person would have known of the falsity and deception of such misrepresentations. Accordingly, Goldberg had reason to know its representations

to RMB as to the ownership of the accounts in question were false, thus they committed a knowing violation of the TCPA and RMB is entitled to treble damages in the amount of $5,500,715.64.

Since the election of remedies doctrine serves only to prevent double redress for a single wrong, RMB may not recover both punitive damages and treble damages. However, if RMB chooses punitive damages under their common law intentional misrepresentation claim, it is still entitled to recover attorney's fees under the TCPA. See Miller v. United Automax, 166 S.W.3d 692, 697-98 (Tenn. 2005).[9]

## V.    Other Pending Motions

The Court agrees with RMB's counsel's contention that if the Court grants their motion for summary judgment, all other pending, discovery-related motions are moot. Accordingly, the Court **DENIES** the following motions as **MOOT**:

- Motion to Compel or to Extend Deadline to File Motion to Compel [Doc. 13];

- Motion to Extend Discovery Deadline for Purposes of Depositions Pending Motion for Summary Judgment [Doc. 14];

- Motion to Extend Deadline to File Plaintiff's Final Witness List [Doc. 16]

---

[9]The Court declines to address RMB's argument that Goldberg submitted Steven Goldberg's affidavit in bad faith. Since the Court finds RMB is entitled to attorney's fees under the TCPA, it is not necessary to reach a determination as to whether Goldberg submitted the affidavit in bad faith and in an attempt to further delay these proceedings.

23

### VI.    Conclusion

For the reasons listed above, RMB's Motion for Summary Judgment [**Doc. 10**] is **GRANTED IN PART** as to Goldberg's liability. This Court's ruling resolved all of RMB's claims as to Goldberg's liability on the law; however, the issue of damages, specifically RMB's election of remedies to wit: whether RMB seeks punitive damages for the common law intentional misrepresentation claim or treble damages under the TCPA, is still before the Court. The Court is presently unable to resolve this issue at this time without further clarification from RMB. Therefore, the bench trial scheduled for June 11, 2008 is **cancelled,** but the parties are nonetheless directed to appear before this Court on **June 11, 2008 at 9:00 a.m.** for a hearing with regard to RMB's damages. The Court finds further elucidation is needed from RMB before it can enter judgment accordingly. Therefore, at the June 11, 2008 hearing, RMB shall inform the Court of its preferred remedy, whether additional hearings are necessary, and submit information and affidavits in support of its request for attorney's fees. Goldberg shall be prepared to address these issues as well.

In light of this ruling, the following motions are **DENIED AS MOOT**: Motion to Compel or to Extend Deadline to File Motion to Compel [**Doc. 13**]; Motion to Extend Discovery Deadline for Purposes of Depositions Pending Motion for Summary Judgment [**Doc. 14**]; and Motion to Extend Deadline to File Plaintiff's Final Witness List [**Doc. 16**].

**IT IS SO ORDERED.**

ENTER:

_s/ C. Clifford Shirley, Jr._
United States Magistrate Judge

## news & analysis

# Florida Broker Faces Multiple Lawsuits

There are at least three lawsuits and up to a dozen formal complaints lodged against Goldberg & Associates LLC, an investment firm in Boca Raton, Fla., regarding its purchases and re-sales of consumer debt portfolios.

Industry insiders tell CCR the scale of Goldberg's alleged mis-deeds occurs very rarely, yet it points to gaps in professionalism and ethics that taint the entire industry.

Hudson & Keyse LLC, a well-estab-lished debt broker in Painesville, Ohio, is among those suing Goldberg & Associates. In its lawsuit filed Nov. 5 in U.S. District Court, Southern District of Florida, H&K alleges that Goldberg agreed to buy consumer accounts with a face value of $47.8 million for $2.4 million, to close July 27.

According to the suit, Goldberg failed to pay the purchase price; used the consumer information "to attempt to collect the amounts owned by the con-sumers despite the fact that H&K is the true owner of the accounts"; "sold or at-tempted to sell and assign some or all of the proprietary information concerning the consumer accounts to third parties"; and failed to return the portfolio to H&K.

RMB Holdings LLC sued Goldberg & Associates on Oct. 29, in U.S. District Court, Eastern District of Tennessee, al-leging breach of contract after buying a portfolio to which Goldberg allegedly did not hold title. The $1.66 million sale closed Aug. 22.

In its suit, Knoxville, Tenn.-based RMB alleges that Goldberg & Associates "did not own and had no right to sell" the portfolio. When RMB began collect-ing on the accounts, it "determined that the representations and warranties made by the defendant as to title to the accounts was false."

RMB repeatedly demanded a refund but Goldberg "has not followed through on any number of promises to do so," the suit alleges.

NorAm Capital Holdings, Dallas,



acquired a portfolio from Goldberg & Associates in December.

"The seller represented that he was the principal owner and provided an evaluation portfolio, a seller survey, media samples as well as the executed contract from the originator," NorAm co-chairman and CEO Dan Cofall tells CCR.

After closing the purchase, NorAm determined that "not only did the sell-er not have title to the portfolio, but also the evaluation portfolio had been sig-nificantly altered in order to entice NorAm into the transaction."

NorAm demanded an immediate re-fund but has yet to receive it, Cofall says.

### Rebuttal

Steve Goldberg, principal of Goldberg & Associates LLC, tells CCR that NorAm Capital's and RMB Holdings' requests for refunds are valid. "I have every intention of paying them back, dollar for dollar."

Problems at his firm began last June when he learned that associates in California manipulated credit lines for

real estate investments and defrauded him out of "upwards of $17 million." Goldberg says he is taking various ac-tions against these individuals.

"There is no dispute: I owe people money," Goldberg says, adding, "We are working to resolve" those claims.

Regarding the litigation by Hudson & Keyse, Goldberg says his firm is dis-puting it. "We have no idea what the basis of their lawsuit is."

Goldberg has been in regular contact with the management of NorAm and other plaintiffs, he says. (Cofall con-firms that he and Goldberg talk almost daily.)

Goldberg & Associates has exited the debt buying business and remains focused on real estate. Prior to these problems, says Goldberg, "We transact-ed over 100 sales without a single issue or complaint."

### Prevention

"There is a great deal our industry and our trade groups can do to offer mem-bers a more efficient and effective way to vet buyers and sellers," Cofall says. NorAm Capital is considering creating its own file transfer protocol Web site, onto which association members can post copies of filed litigation against debt buyers and sellers.

"So far, our trade associations have not embraced this idea but it's one way the industry can police itself," he says. Cofall proposes several measures that could be adopted without incurring legal liabilities, some of which follow:

• Provide a Web site whereby a member may post any filed or settled litigation against another member.

• Update all current member infor-mation and have officers and significant shareholder members sign a form stat-ing they haven't been convicted of, nor are currently charged with, a felony or any other crime related to the industry.

Broker continued on page 10

EXHIBIT



**wind SEARCH**
THE LEADER IN ASSET LOCATION SERVICES™
888-WINDSEARCH (946-37321)
www.888windsearch.com

YOUR BEST SOURCE
FOR ASSET DATA –
GUARANTEED.



AUTOMATED COLLECTION CONTROL, INC.!
YOU'VE GOT CLAIMS™

HUNDREDS OF AGENCIES MANAGED

MILLIONS OF ACCOUNTS TRACKED
AND ANALYZED

Contact Celeste Anderson, Director of Sales
888-321-3415   andersonc@youvegotclaims.com
www.youvegotclaims.com

## news & analysis

Broker continued from page 8

• Failure to provide accurate information is grounds for immediate membership termination.

"If membership consists of only filling out a form and paying a fee, then we cheapen the value of the membership and the association. Also, it completely fails to support the argument of self-regulation if we have felons and con men as current members," Cofall says.

A defrauded buyer or seller should "aggressively pursue" the perpetrator, and make it public in order to prevent others from being defrauded, Cofall says.

"We spoke up at the DBA convention and were greeted with great enthusiasm by many members but not so much by the various associations. If we do not do a better job of self-regulation, some legislative or judicial body will do it for us," he warns.

DBA International conducts background and reference checks on member applicants, Executive Director Roger Knauf says, and the Ethics Committee investigates complaints and makes recommendations to the Board of Directors.

After receiving numerous complaints from members – those involved in disputes and others who were not – DBA suspended Goldberg's membership at the end of January, Knauf says.

Cases like these do not "happen often but are taken quite seriously," says Barbara A. Sinsley, counsel to DBA and partner at Barron, Newburger, Sinsley & Wier PLLC, Tampa, Fla.

"We do not want the bad apples," DBA President Kristin Dougherty says. "In my 16 years in this industry, I can count them on one or both hands. When something egregious occurs, of course we pay attention to it."

The DBA board expects to approve a revised code of ethics this year. Proposed Rule No. 10 reads: "Adhere to all terms of a contract or agreement unless these terms have been legally terminated, falsely represented or substantially altered by unilateral action of the other party to the contract." **CCR**



**Federal Trade Commission**
Protecting America's Consumers

---

Type of Release: December 8, 2004

## FTC Asks Court to Halt Illegal CAMCO Operation

### Company Uses Threats, Lies, and Intimidation to Collect "Debts" Consumers Do Not Owe

In the face of more than 2,000 consumer complaints, the FTC has asked a U.S. District court to order a halt to the harassing, intimidating, deceptive, and illegal 'debt collection' practices of Capital Acquisitions & Management (CAMCO). At the agency's request, the court has frozen the assets of the company and its principals and appointed a receiver to oversee the corporate records and assets, pending trial. The FTC will seek a permanent halt to the illegal threats and lies the defendants use to attempt to collect "time-barred" debts – debts so old that they are beyond the statute of limitations, and cannot appear on credit reports – and debts consumers never incurred and did not owe.

In March 2004, the FTC charged that CAMCO, RM Financial, and their principals were threatening and harassing thousands of consumers to get them to pay old, unenforceable debts or debts they did not owe. The agency alleged that their abusive and deceptive collection practices violated federal law, including the Fair Debt Collection Practices Act. The companies and individuals paid a $300,000 civil penalty to settle the FTC charges, and were barred from engaging in abusive, deceptive, and illegal collection practices in the future.

In the eight months since that settlement, the FTC has received more than 2,000 consumer complaints about CAMCO's illegal tactics – three times more than the agency received in the two years before the settlement.

In papers filed with the court, the agency charged that as much as 80 percent of the money CAMCO collects comes from consumers who never owed the original debt in the first place. Many consumers pay the money to get CAMCO to stop threatening and harassing them, their families, their friends, and their co-workers.

According to the FTC, CAMCO buys old debt lists that frequently contain no documentation about the original debt and in many cases no Social Security Number for the original debtor. CAMCO makes efforts to find people with the same name in the same geographic area and tries to collect the debt from them – whether or not they are the actual debtor. In papers filed with the court, the FTC alleges that CAMCO agents told consumers -- even consumers who never owed the money -- that they were legally obligated to pay. They told consumers that if they did not pay, CAMCO could have them arrested and jailed, seize their property, garnish their wages, and ruin their credit. All of those threats were false, according to the FTC.

According to the FTC, grossly abusive behavior, including shouting and profanity, are commonplace tactics with CAMCO. Collectors told consumers:

- We're "going to hound you 'til the day you die;"

- We will "continue to hunt you;" and

- "We'll get you one way or another."

CAMCO collectors also ignored restrictions on who and when they could call.

The FTC suit asks the court to order a permanent bar on the operation's illegal activities and order redress for consumers.

In addition to CAMCO, the complaint names RM Financial Services, Inc., Capital Properties Holdings, Inc., Caribbean Asset Management, Ltd., Reese Waugh, Jerome Kuebler, Eric Woldoff, George Othon, and Jeffrey Garrington.

CAMCO's offices are located in Rockford and Schaumberg, Illinois. RM Financial is based in Marietta, Georgia. Caribbean Asset Management is based in Montego Bay, Jamaica.

**The Commission vote to authorize staff to file the complaint was 5-0.** The complaint was filed in the U.S. District Court for the Northern District of Illinois Eastern Division, in Chicago, Illinois.

NOTE: The Commission files a complaint when it has "reason to believe" that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest. The complaint is not a finding or ruling that the defendant has actually violated the law. The case will be decided by the court.

Copies of the complaint and legal documents related to an earlier settlement with CAMCO and individual defendants are available from the FTC's Web site at http://www.ftc.gov and also from the FTC's Consumer Response Center, Room 130, 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The FTC works for the consumer to prevent fraudulent, deceptive, and unfair business practices in the marketplace and to provide information to help consumers spot, stop, and avoid them. To file a complaint in English or Spanish (bilingual counselors are available to take complaints), or to get free information on any of 150 consumer topics, call toll-free, 1-877-FTC-HELP (1-877-382-4357), or use the complaint form at http://www.ftc.gov. The FTC enters Internet, telemarketing, identity theft, and other fraud-related complaints into Consumer Sentinel, a secure, online database available to hundreds of civil and criminal law enforcement agencies in the U.S. and abroad.

**Media Contact:**

> Claudia Bourne Farrell
> Office of Public Affairs
> 202-326-2181

**Staff Contact:**

> Steven Baker or David O'Toole
> Midwest Region
> 312-960-5634

---

**E-mail this News Release**
If you send this link to someone else, the FTC will not collect any personal information about you or the recipient.

| Related Documents: |
| --- |

Federal Trade Commission, Plaintiff, v. Capital Acquisitions and Management Corp., a corporation; RM Financial Services, Inc., a corporation; Reese Waugh, individually and as an officer Of Capital Acquisitions and Management Corp. and RM Financial Services, Inc. Jerome Kuebler, individually and as an officer of Capital Acquisitions and Management Corp.; Scott R. Franson, individually and as an owner and manager of Capital Acquisitions And Management Corp.; and Mario Bianchi, Individually and as a manager of Capital Acquisition & Management Company, defendants., United States District Court for the Northern District of Illinois, Western Division, Case No. 04C50 147

Last Modified: Monday, 25-Jun-2007 16:19:00 EDT

Attorney No. 99000

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

THE PEOPLE OF THE STATE OF ILLINOIS,    )
                                          )
                    Plaintiff,            )
                                          )    NO. 07CH02475
        v.                                )
                                          )
ARROW FINANCIAL SERVICES, LLC,            )
                                          )
                    Defendant.            )

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

NOW COMES Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA

MADIGAN, Attorney General of the State of Illinois, brings this action complaining of

Defendant, ARROW FINANCIAL SERVICES, LLC (hereinafter, "ARROW FINANCIAL"),

and states as follows:

### I. JURISDICTION AND VENUE

1.      This action is brought for and on behalf of THE PEOPLE OF THE STATE OF

ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, pursuant to the

provisions of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*

(2004), and her common law authority as Attorney General to represent the People of the State

of Illinois.

2.      Venue for this action properly lies in Cook County, Illinois, pursuant to sections

2-101 and 2-102(a) of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, 735 ILCS 5/2-

102(a), in that ARROW FINANCIAL is doing business in Cook County, Illinois.



## II. PARTIES

3.    Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, is charged, *inter alia*, with the enforcement of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*

4.    Defendant, ARROW FINANCIAL, is an Illinois limited liability company, registered on December 3, 1997. ARROW FINANCIAL has been a licensed collection agency since February 13, 1998. ARROW FINANCIAL operates from the address of 5996 W. Touhy Ave., Niles, Illinois 60714.

5.    For purposes of this Complaint for Injunctive and Other Relief, any references to the acts and practices of ARROW FINANCIAL shall mean that such acts and practices are by and through the acts of said corporation's officers, owners, directors, employees, or other agents.

## III. COMMERCE

6.    Subsection 1(f) of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1(f), defines "trade" and "commerce" as follows:

> The terms 'trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.

7.    Defendant, ARROW FINANCIAL, was at all times relevant hereto, engaged in trade and commerce in the State of Illinois, to-wit: debt management and collection services.

## IV. DEFENDANT'S COURSE OF CONDUCT

8.    ARROW FINANCIAL maintains offices in Niles, Illinois, Gaithersburg, Maryland, San Diego, California, Whitewater, Wisconsin, and Rockville Centre, New York.

9.    ARROW FINANCIAL provides debt management and collection services to some of its clients. Debt managers, such as ARROW FINANCIAL, facilitate a payment arrangement between a debtor and creditor over a debt that was originally not paid.

10.    ARROW FINANCIAL also purchases debts from various creditors who have charged off the debt. Moreover, ARROW FINANCIAL purchases the debts at a substantial discount from large commercial retailers or credit card issuers nationwide and attempts to collect from the original debtors.

11.    Typically, the debts purchased by ARROW FINANCIAL are credit card debts and installment debts.

12.    In many instances, ARROW FINANCIAL attempts to collect on time-barred debts that are over ten years old.

13.    ARROW FINANCIAL attempts to collect on debts that have been discharged in bankruptcy and on debts that have been settled.

14.    ARROW FINANCIAL attempts to collect on debts through collection letters sent to consumers and through telephone calls made by ARROW FINANCIAL's debt collectors. Such collection letters and telephone calls are sent or placed to consumers, some of whom are over age 65, in the State of Illinois and throughout the United States.

15.    ARROW FINANCIAL engages in a variety of abusive practices in its contacts with consumers. For example, ARROW FINANCIAL regularly call consumers at work, even if it is told that such calls are prohibited by the employers or the consumers notify ARROW FINANCIAL that such calls are inconvenient. ARROW FINANCIAL also harasses consumer's neighbors, family and co-workers in an attempt to embarrass or put pressure on consumers to pay the debts.

16.     During telephone calls, ARROW FINANCIAL's collectors frequently use abusive or profane language to intimidate consumers and scream at consumers into paying the debt in question.

17.     In some cases, ARROW FINANCIAL attempts to collect on debts that are not owed by the consumers in question, and the consumers are pressured into making payments.

18.     When consumers request, verbally and in writing that ARROW FINANCIAL send them documents, which verify that they owe the debt in question, ARROW FINANCIAL refuses to do so.

19.     ARROW FINANCIAL attempts to collect on debts after they receive written notification from consumers that they dispute the debt in question.

20.     In some cases, ARROW FINANCIAL withdraws money from consumers' bank accounts despite the fact that consumers did not authorize such withdrawals from their checking and/or savings accounts.

21.     In some cases, ARROW FINANCIAL threatens to sue consumers who do not pay ARROW FINANCIAL for the alleged debts. In truth, however, ARROW FINANCIAL has no intention to take legal action against the consumers, and any legal action would be unsuccessful in any event.

22.     ARROW FINANCIAL has attempted, and is continuing to attempt to collect debts from consumers in a manner that violates federal fair debt collection practices law.

23.     In connection with the collection of the above referenced debts, ARROW FINANCIAL's employees have represented to consumers, expressly or by implication, that:

        a.     the consumer can be arrested or imprisoned for failing to pay the debt in question;

    b.    the consumer has a legal obligation to pay the debt in question;

    c.    ARROW FINANCIAL will file a lawsuit against the consumer; and

    d.    ARROW FINANCIAL will take other types of actions that will have an adverse affect on the consumer's credit report if the debt is not paid.

24.    In truth and in fact:

    a.    the consumer cannot be arrested or imprisoned for failing to pay the debt;

    b.    the consumer is not legally obligated to pay the defendants;

    c.    in most instances, ARROW FINANCIAL cannot or will not take formal legal action against consumers for failing to pay the debt;

    d.    in most instances, ARROW FINANCIAL cannot take any type of action that will have an adverse affect on the consumers' credit report.

25.    The following allegations in paragraphs 26 through 79 are pled merely as illustrations of the unlawful business practices of ARROW FINANCIAL and are not meant to be exhaustive. The unlawful activities of defendant are ongoing and Plaintiff reserves the right to prove that other consumers have been injured as a result of said unlawful practices. Thus far, 669 complaints against ARROW FINANCIAL have been filed with the Office of the Illinois Attorney General and over 800 complaints against ARROW FINANCIAL have been filed with the Better Business Bureau.

A. <u>Consumer: Jan Craig</u>

26.    In May 2005, ARROW FINANCIAL began attempting to collect a debt from Jan Craig by calling her home and leaving an automated message. Ms. Craig resides in Bradenton, Florida.

27.    During the initial conversation, ARROW FINANCIAL informed Ms. Craig that "Janice L. Craig" owed a Capital One credit card debt in the amount of $1,040.06. Ms. Craig informed ARROW FINANCIAL that the debt was not hers because she never had a Capital One credit card. She was concerned that she may have been a victim of identity theft.

28.    Ms. Craig contacted Capital One directly, and provided a representative with her social security number. Capital One confirmed that there was no match in their system and that she did not own a Capital One credit card.

29.    ARROW FINANCIAL continued to call Ms. Craig despite her explanation that the debt was not hers. When Ms. Craig requested ARROW FINANCIAL's address to confirm that ARROW FINANCIAL was not engaged in a scam, the ARROW FINANCIAL representative refused, stating that he was not going to give her the address so that she could "harass them." The ARROW FINANCIAL representative also threatened that he would call Ms. Craig "at all hours of the night" if she did not pay.

30.    Ms. Craig could not obtain the address until she informed ARROW FINANCIAL that she would pay the amount and asked where she should send the check. ARROW FINANCIAL responded that she should "add five or six dollars" to the balance due for interest.

31.    Ms. Craig ordered a credit report in February 2006 after her purse was stolen. She learned that the credit bureaus had merged her credit report in error with someone else's report named "Janice L. Craig," although they both have different social security numbers. After she contacted the credit bureaus, they corrected the error. Thereafter, ARROW FINANCIAL ceased communications with Ms. Craig.

## B. Consumer: Georgia Thomas Marshall

32.    In Spring of 2005, ARROW FINANCIAL contacted Georgia Thomas Marshall by telephone concerning a Capital One credit card debt of over $900 incurred in 2000 or 2001. Ms. Marshall resides in Gary, Indiana.

33.    ARROW FINANCIAL would call Ms. Marshall, leaving voice mail messages, up to five or six times a day for a period of about two months.

34.    In April 2005, Ms. Marshall contacted ARROW FINANCIAL to resolve the collection and arrange a payment. Ms. Marshall and an ARROW FINANCIAL representative, Inez Leslie, agreed on a settlement amount of $558.12. Ms. Marshall informed Ms. Leslie that she would provide a check to ARROW FINANCIAL at the end of April, to which Ms. Leslie agreed. Ms. Marshall also informed Ms. Leslie that Ms. Marshall would call ARROW FINANCIAL on April 28, 2005 concerning the payment.

35.    During the conversation, Ms. Marshall requested that ARROW FINANCIAL cease contacting her place of employment because her employer did not approve of communications concerning collection matters. Ms. Leslie agreed to cease contacting Ms. Marshall at her workplace and that she would place that request in ARROW FINANCIAL's computer records.

36.    However, on April 28, 2005, when Ms. Marshall arrived at work, the secretary handed her a phone message from Ms. Leslie of ARROW FINANCIAL.

37.    While Ms. Marshall was working, her boss handed her a fax addressed to him from ARROW FINANCIAL. He had received the fax that morning at 11:00 a.m. The faxed document was entitled "verification of employment request form." After her boss requested that Ms. Marshall take care of the matter, she called Ms. Leslie.

38.    Upon contacting Ms. Leslie, she told Ms. Marshall that John Armstrong, the manager, informed her to disregard Ms. Marshall's request that ARROW FINANCIAL cease contacting her at her place of employment. Ms. Leslie also stated that ARROW FINANCIAL "could do whatever they wanted" to collect from Ms. Marshall.

39.    Ms. Marshall gave Ms. Leslie her bank account number and authorized her to debit the entire amount due on the account.

40.    Ms. Marshall later found that Ms. Leslie had first called Ms. Marshall's workplace that morning to obtain her boss's name and fax number, and called a second time to inquire whether he received the fax.

41.    The same day, on April 28, 2005, when Ms. Marshall arrived home, she received a letter from ARROW FINANCIAL dated April 25, 2005, sent out days prior to the agreed upon due date. In the letter, ARROW FINANCIAL had stated that the payment of $558.12 was due in their office by April 29, 2005.

## C. Consumer: Carole Hawkins

42.    Carole Hawkins resides in Brunswick, Georgia.

43.    ARROW FINANCIAL first contacted Carole Hawkins on December 27, 2004 at approximately 8:00 p.m. An ARROW FINANCIAL representative, Nelson, falsely identified himself as a MasterCard agent and that he was calling in regards to a promotional offer. In fact, Nelson was calling concerning a credit card balance of Ms. Hawkins' former husband, Doug Hawkins.

44.    When Ms. Hawkins disclosed that she and Mr. Hawkins are divorced, Nelson demanded Mr. Hawkins' personal information, including whether he owned a home.

45.　Nelson, thereafter, proceeded to yell at Ms. Hawkins about Mr. Hawkins' failure to pay the debt, asked who received the house in the divorce, and stated that the person who paid the bills probably owes the debt.

46.　Ms. Hawkins hung up the phone, but Nelson called back four times. Ms. Hawkins kept hanging up on him and when her boyfriend picked up the call, Nelson asked whether he was Mr. Hawkins.

47.　The following day, Ms. Hawkins traced the phone number on her caller identification in order to complain about the incident with ARROW FINANCIAL. The phone number was listed as Arrow Service Bureau, which was not the business that was contacting her, and the number was only for an outgoing line. She was only able to obtain the correct company name and telephone number after she contacted the Georgia Attorney General's Office. The Georgia Attorney General's Office informed her that the correct company name is ARROW FINANCIAL SERVICES.

48.　In the eleven times that Ms. Hawkins called ARROW FINANCIAL, she could not reach a supervisor. Finally, an ARROW FINANCIAL located in San Diego, California informed her of Nelson's full name, Nelson Hudson, his supervisor's name, Steve McCormick, and telephone number.

49.　When Ms. Hawkins attempted to call Mr. McCormick, the telephone number given to her by ARROW FINANCIAL in San Diego, California was to Nelson instead. Nelson refused to connect her to the supervisor and demanded her full name. Ms. Hawkins made another attempt to reach the supervisor through the same number but reached Nelson again. He stated that she would never get through to a supervisor.

50.     Ms. Hawkins attempted another 800 number for ARROW FINANCIAL and spoke with several operators who never took her complaint against Nelson.

51.     Instead, the operators tried to gain information about Mr. Hawkins. Ms. Hawkins finally reached Bill McClinton, another supervisor, who informed Ms. Hawkins that Mr. McCormick had not worked at ARROW FINANCIAL for months. However, when Ms. Hawkins had previously requested to speak with Mr. McCormick, ARROW FINANCIAL informed her that he simply was not in the office.

52.     Mr. McClinton took Ms. Hawkins' complaint against Nelson, but stated that Nelson was a seasoned employee, and thus found her complaint unbelievable.

53.     Then Mr. McClinton shifted the conversation in an attempt to obtain information about Mr. Hawkins in relation to the unpaid debt.

54.     Ms. Hawkins never received any resolution to her complaint against Nelson.

55.     Only after Ms. Hawkins filed a complaint against ARROW FINANCIAL with the Illinois Attorney General's office did ARROW FINANCIAL send a letter stating that it would review the conduct of the representative and take appropriate action. ARROW FINANCIAL also stated that Mr. Hawkins' account had been closed.

### D. Consumer: Douglas D. Graham

56.     In January 2005, ARROW FINANCIAL first contacted Douglas D. Graham by letter addressed to him but sent to his father's address. Douglas D. Graham's father, Douglas T. Graham is an elderly person living in a retirement community. Douglas D. Graham lives in Studio City, California.

57.    ARROW FINANCIAL stated in the letter that Douglas D. Graham has a past due balance of $963.97 with Encyclopedia Britannica, although neither he nor any family member ever had an account with Encyclopedia Britannica.

58.    Douglas D. Graham contacted ARROW FINANCIAL by telephone to explain that the debt was not his and that ARROW FINANCIAL had sent the letter to his father's address. He spoke with an ARROW FINANCIAL representative, who would only identify himself as "Bill."

59.    Through the conversation, Douglas D. Graham found that ARROW FINANCIAL had his social security number and his telephone number, but also had another telephone number that never corresponded to him. When Douglas D. Graham requested written documentation to support the debt claim, Bill was extremely rude and refused to comply with the request. Douglas D. Graham informed Bill that he was going to refer the matter to the Office of the Attorney General.

60.    On January 27, 2005, Douglas D. Graham mailed a letter to ARROW FINANCIAL's legal department to dispute the debt and demanded that ARROW FINANCIAL delete the account from its files and remove any negative information on his credit report. Douglas D. Graham never received a response from ARROW FINANCIAL.

61.    Only as a response to his filed complaint with the Office of the Attorney General did Douglas D. Graham receive a letter from ARROW FINANCIAL stating that it would close his account "as a courtesy" to the Office of the Attorney General.

E. Consumer: Melanie Penrod

62.    In 2005, Melanie Penrod noticed an adverse entry on her credit report placed by ARROW FINANCIAL concerning a prior debt Ms. Penrod had with First Premier. Ms. Penrod

had paid off the two accounts with First Premier in November 2002 through the assistance of a debt relief service that obtained a settlement for her.   Ms. Penrod resides in Andover, Kansas.

63.    Ms. Penrod called ARROW FINANCIAL several times to explain the debt settlement, but only received a response that the debt was unpaid, after which the ARROW FINANCIAL representative would hang up on the call.

64.    Thereafter, on May 8, 2006 and again on June 8, 2006, Ms. Penrod faxed and mailed letters to ARROW FINANCIAL requesting that ARROW FINANCIAL validate the debt.

65.    Ms. Penrod never received proof that she owed any debt or that ARROW FINANCIAL investigated the debt.

66.    Only after Ms. Penrod filed a complaint against ARROW FINANCIAL with the Illinois Attorney General's office did ARROW FINANCIAL send a letter stating that it settled with Ms. Penrod and that it closed her account.

F. Consumer: Jose Duarte

67.    Sometime in 2004, ARROW FINANCIAL first contacted Jose Duarte by letter, in which ARROW FINANCIAL stated that Mr. Duarte owes approximately $600 on a Montgomery Ward account that Mr. Duarte had cancelled ten years ago.   Soon after, Mr. Duarte began receiving calls and notices regarding a debt owed to Montgomery Wards.   Mr. Duarte had cancelled the account after he learned that someone had raised the credit limit amount without his authorization and Montgomery Ward had shown him a document with a falsified signature. Furthermore, when Mr. Duarte had previously cancelled his account, Montgomery Wards had never informed him of any outstanding balance.   After awhile, the calls stopped but started again in 2005.   Mr. Duarte received calls approximately once a week for several months at a time.   Mr. Duarte resides in Franklin Park, Illinois.

68.     Mr. Duarte explained to ARROW FINANCIAL that although he once had a Montgomery Wards account he had cancelled it.  However, ARROW FINANCIAL responded that if he once owned the card, he was obliged to pay the debt.

69.     Despite his request for written proof of the debt, ARROW FINANCIAL never submitted any documents to Mr. Duarte.

70.     When Mr. Duarte explained to ARROW FINANCIAL that he wished to have copies of any supporting documents of the debt so that he could show his lawyer, ARROW FINANCIAL responded that it would sue Mr. Duarte because it also had lawyers.

71.     Mr. Duarte's credit report showed nothing about a Montgomery Ward account when he checked his report before purchasing his home.

72.     The debt does not belong to Mr. Duarte, and he does not know who made the charges onto the account.

### G.  Consumer:  Jerry L. Nehls and Gail Nehls

73.     In March 2004, ARROW FINANCIAL first contacted Jerry L. Nehls and Gail Nehls, husband and wife, by letter, in which ARROW FINANCIAL stated that Mr. and Mrs. Nehls owes a Capital One credit card debt.  Mr. and Mrs. Nehls reside in Sunnyside, Washington.

74.     Mrs. Nehls had previously been a victim of credit card theft, and therefore had . notified the Capital One credit card company and the police department.

75.     Mrs. Nehls therefore contacted ARROW FINANCIAL to explain the credit card theft and the police report filing.  ARROW FINANCIAL's representative, Sara Love, stated that ARROW FINANCIAL never received a "f—ing" report and that Capital One would get a hold

of Mrs. Nehls and put her in jail. Ms. Love stated the number of days that Mrs. Nehls would be

in jail, while stating the "f-word" a few times within the conversation.

76.     Thereafter, Mr. Nehls called ARROW FINANCIAL to complain about Ms. Love.

Ms. Love's supervisor, Mike, told Mr. Nehls to quit wasting his time and hung up on the call.

77.     ARROW FINANCIAL made calls to Mr. and Mrs. Nehls up to six times a day.

Even after they changed their telephone number and moved, ARROW FINANCIAL continued to

call and send mail until January 2006.

78.     In May 2005, Mr. and Mrs. Nehls filed a complaint with the Office of the

Attorney General. In response to the complaint filed, ARROW FINANCIAL sent a letter to the

Office of the Attorney General, in which it merely stated that there was no indication that Ms.

Love used profane language towards Mr. and Mrs. Nehls.

79.     Although ARROW FINANCIAL has ceased contacting Mr. and Mrs. Nehls,

ARROW FINANCIAL has apparently sold or transferred the debt to another debt collector. Mr.

and Mrs. Nehls now receive calls from the other debt collector concerning the same Capital One

debt.

## V. APPLICABLE STATUTES

80.     Section 2 of the Consumer Fraud and Deceptive Business Practices Act, 815

ILCS 505/2, provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including
> but not limited to the use or employment of any deception, fraud, false pretense,
> false promise, misrepresentation or the concealment, suppression or omission of
> any material fact, with intent that others rely upon the concealment, suppression
> or omission of such material fact, or the use or employment of any practice
> described in section 2 of the 'Uniform Deceptive Trade Practices Act', approved
> August 5, 1965, in the conduct of any trade or commerce are hereby declared
> unlawful whether any person has in fact been misled, deceived or damaged
> thereby.

81.    The federal Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.*, prohibits abusive, deceptive, and unfair debt collection practices by debt collectors.

82.    Section 1692a(6) of the Fair Debt Collection Practices Act states in part as follows:

> The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due to asserted to be owed or due another.

15 U.S.C. §1692a(6).

83.    Prohibited acts of harassment or abuse under the Fair Debt Collection Practices Act include the following:

a.    Using obscene or profane language in debt collection attempts.  15 U.S.C. §1692d(2).

b.    Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with the intent to annoy, abuse, or harass any person at the called number.  15 U.S.C. §1692d(5).

c.    Except as provided in section 1692b of the Act, the placement of telephone calls without meaningful disclosure of the caller's identity.

84.    The following acts are deemed false, deceptive, and misleading representations or means in connection with the collection of any debt, under the Fair Debt Collection Practices Act:

a.    Representing or implying that nonpayment of any debt will result in the arrest or imprisonment of any person ...unless such action is lawful and the debt collector intends to take such action.  15 U.S.C. §1692d(4).

-15-

b.    Threatening to take any action that cannot legally be taken or that is not intended to be taken.  15 U.S.C. §1692e(5).

c.    Communicating or threatening to communicate to any person credit information, which is known or which should be known to be false, including the failure to communicate that a debt is disputed. 15 U.S.C. §1692e(8).

d.    Using false representations or deceptive means to collect or attempt to collect any debt or to obtain any information concerning a consumer.  15 U.S.C. §1692e(10).

85.    The following act is deemed to be an unfair practice under the Fair Debt Collection Practices Act:

Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if there is no present right to possession of the property claimed as collateral through an enforceable security interest or there is no present intention to take possession of the property...

15 U.S.C. §1692f(6)(A)(B).

86.    The Fair Debt Collection Practices Act states the following with regard to disputed debts:

If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) of this section that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector.

15 U.S.C. §1692g(b).

## VI. VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

87.    ARROW FINANCIAL has engaged in a course of trade or commerce, which

constitutes unfair and deceptive acts or practices declared unlawful under section 2 of the

Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, by:

a.  engaging in the unfair or deceptive practice of attempting to collect on

debts that are not owed by the consumer in question;

b.  engaging in the unfair or deceptive practice of attempting to collect on

debts that have been discharged in settlement;

c.  engaging in the unfair practice of using abusive language to intimidate

consumers to pay the debt in question;

d.  representing through verbal threats or by implication that ARROW

FINANCIAL would take the consumer to court for failing to pay a debt, when in

fact, ARROW FINANCIAL cannot assert a cause of action on the debt because

they are engaging in the unfair or deceptive practice of attempting to collect on

debts that are time barred;

e.  engaging in the unfair or deceptive practice of failing to provide

verification when the debt is disputed by the consumer;

f.  engaging in the unfair or deceptive practice of attempting to collect on

such debts after consumers dispute such debts;

g.  failing to disclose and misrepresenting ARROW FINANCIAL's true

identity and purpose of the call to obtain the consumer's personal information and

profit from collecting on debts;

h.  representing orally that ARROW FINANCIAL agrees to a discounted

settlement amount and debt payment arrangement, when in fact, ARROW

FINANCIAL would refuse to comply with the agreement and would demand more payment;

i.　　representing through verbal threats that ARROW FINANCIAL would have the consumer arrested and imprisoned for failing to pay a debt, when in fact, the consumer could not be arrested or imprisoned;

j.　　engaging in the unfair practice of placing harassing telephone calls to consumers, including but not limited to placing calls to the consumer's place of employment and relative's homes;

k.　　engaging in the unfair or deceptive practice of withdrawing funds from a consumer's account without authorization;

l.　　representing orally that ARROW FINANCIAL agrees to stop calling a consumer at his or her workplace, when in fact, ARROW FINANCIAL would continue to harass both consumer and employer by telephone and facsimile;

m.　　representing orally that ARROW FINANCIAL would close the consumer's account, when in fact, ARROW FINANCIAL closes the account but would transfer or sell the account to another debt collector, while knowing that the new debt collector would make attempts to collect from the consumer;

n.　　engaging in the unfair act or practice of reporting unsubstantiated debt claims to a consumer's credit report;

o.　　representing expressly that ARROW FINANCIAL would close the consumer's account out of a "courtesy" to the Office of the Attorney General, upon investigation, when in fact, ARROW FINANCIAL closed the consumer account to avoid further investigation of illegal debt collection activities; and

p.      representing directly or by implication that ARROW FINANCIAL is legally collecting debts from consumers, when in fact, ARROW FINANCIAL's debt collection practices violate the federal Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.*, based on the conduct referenced above. Specifically, ARROW FINANCIAL has violated the following provisions of the Fair Debt Collection Practices Act:

i.      violating 15 U.S.C. §1692d(2) by using obscene or profane language when attempting to collect on debts from consumers;

ii.      violating 15 U.S.C. §1692d(5) by calling consumers repeatedly at their place of employment after consumers stated that they did not wish to receive such calls;

iii.      violating 15 U.S.C. §1692e(4) by representing or implying that nonpayment of a debt would result in the arrest or imprisonment of the consumer from whom ARROW FINANCIAL was attempting to collect the debt;

iv.      violating 15 U.S.C. §1692e(5) by threatening to take legal action that cannot legally be taken or that is not intended to be taken;

v.      violating 15 U.S.C. §1692e(10) by using false representations or deceptive means to collect or attempt to collect any debt; and

vi.      violating 15 U.S.C. §1692g(b) by continuing to collect on debts after consumers notified ARROW FINANCIAL in writing that they dispute the debt.

## VII. STATUTORY REMEDIES

88.     Section 7 of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7, provides:

> Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceeding would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including, but not limited to: injunction, revocation, forfeiture or suspension of any license, charter franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver; dissolution of domestic corporations or association suspension or termination of the right of foreign corporations or associations to do business in this State; and restitution.

> In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act. In the event the court finds the method, act or practice to have been entered into with intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

> In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

89.     Section 10 of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10, provides: "In any action brought under the provisions of this Act, the Attorney General is entitled to recover costs for the use of this State."

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this honorable Court enter an Order:

A.      Finding that ARROW FINANCIAL has violated section 2 of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1; including, but not limited to, the unlawful acts and practices alleged herein;

-20-

B.     Temporarily, preliminarily and permanently enjoining ARROW FINANCIAL from engaging in acts and practices, which violate section 2 of the Consumer Fraud and Deceptive Business Practices Act, including but not limited to the acts and practices cited above;

C.     Temporarily, preliminarily and permanently enjoining ARROW FINANCIAL from engaging in the business of debt management and collection services in or from the State of Illinois;

D.     Declaring that all contracts entered into between ARROW FINANCIAL and Illinois consumers by the use of methods and practices declared unlawful are rescinded and requiring that full restitution be made to said consumers;

E.     Requiring ARROW FINANCIAL to pay restitution to all consumers who have been harmed by ARROW FINANCIAL's unlawful acts and practices;

F.     Assessing a civil penalty in the amount of Fifty Thousand Dollars ($50,000) per violation of the Act found by the Court to have been committed by ARROW FINANCIAL with the intent to defraud; if the Court finds ARROW FINANCIAL has engaged in methods, acts or practices declared unlawful by the Act, without the intent to defraud, then assessing a statutory civil penalty of Fifty Thousand Dollars ($50,000), all as provided in section 7 of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7;

G.     Assessing an additional civil penalty in the amount of Ten Thousand Dollars ($10,000) per violation of the Consumer Fraud and Deceptive Business Practices Act found by the Court to have been committed by ARROW FINANCIAL against a person 65 years of age and older as provided in section 7(c) of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7(c);

H.     Requiring ARROW FINANCIAL to pay all costs for the prosecution and investigation of this action, as provided by section 10 of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10; and

I.     Providing such other and further equitable relief as justice and equity may require.

Respectfully Submitted,
THE PEOPLE OF THE STATE OF
ILLINOIS, by LISA MADIGAN,
ATTORNEY GENERAL OF ILLINOIS

BY: _____
     CHARLES G. FERGUS
     Chief, Consumer Fraud Bureau

Attorney #99000
LISA MADIGAN
Attorney General of Illinois
CHARLES G. FERGUS
Chief, Consumer Fraud Bureau
JUNKO MINAMI
Assistant Attorney General
Consumer Fraud Bureau          BY: _____
100 W. Randolph Street, 12th Floor        JUNKO MINAMI
312-814-7130 Telephone                    Assistant Attorney General
312-814-2593 FAX                          Consumer Fraud Bureau

SB1398 Enrolled                    LRB095 08474 RAS 28653 b

1    AN ACT concerning regulation.

2    **Be it enacted by the People of the State of Illinois,**

3    **represented in the General Assembly:**

4    Section 5. The Collection Agency Act is amended by changing

5    Sections 2, 2.03, and 3 and by adding Sections 9.1, 9.2, 9.3,

6    9.4, and 9.7 as follows:

7    (225 ILCS 425/2) (from Ch. 111, par. 2002)

8    (Section scheduled to be repealed on January 1, 2016)

9    Sec. 2. Definitions. In this Act:

10   "Consumer credit transaction" means a transaction between

11   a natural person and another person in which property, service,

12   or money is acquired on credit by that natural person from such

13   other person primarily for personal, family, or household

14   purposes.

15   "Consumer debt" or "consumer credit" means money,

16   property, or their equivalent, due or owing or alleged to be

17   due or owing from a natural person by reason of a consumer

18   credit transaction.

19   "Creditor" means a person who extends consumer credit to a

20   debtor.

21   "Debt" means money, property, or their equivalent which is

22   due or owing or alleged to be due or owing from a natural

23   person to another person.



SB1398 Enrolled　　　　　　- 2 -　　　　LRB095 08474 RAS 28653 b

1　　　　"Debt collection" means any act or practice in connection
2　　with the collection of consumer debts.
3　　　　"Debt collector", "collection agency", or "agency" means
4　　any person who, in the ordinary course of business, regularly,
5　　on behalf of himself or herself or others, engages in debt
6　　collection.
7　　　　"Debtor" means a natural person from whom a debt collector
8　　seeks to collect a consumer debt that is due and owing or
9　　alleged to be due and owing from such person.
10　　　　"Department" means Division of Professional Regulation
11　　within the Department of Financial and Professional
12　　Regulation.
13　　　　"Director" means the Director of the Division of
14　　Professional Regulation within the Department of Financial and
15　　Professional Regulation.
16　　　　"Person" means a natural person, partnership, corporation,
17　　limited liability company, trust, estate, cooperative,
18　　association, or other similar entity. ~~Unless the context~~
19　　~~clearly requires otherwise, the following terms have the~~
20　　~~meanings ascribed to them in Sections 2.01 through 2.02.~~
21　　(Source: P.A. 78-1248.)

22　　　　(225 ILCS 425/2.03) (from Ch. 111, par. 2005)
23　　　　(Section scheduled to be repealed on January 1, 2016)
24　　　　Sec. 2.03. This Act does not apply to persons whose
25　　collection activities are confined to and are directly related

SB1398 Enrolled           - 3 -      LRB095 08474 RAS 28653 b

1  to the operation of a business other than that of a collection

2  agency, and specifically does not include the following:

3      1. Banks, including trust departments, affiliates, and

4  subsidiaries thereof, fiduciaries, and financing and

5  lending institutions (except those who own or operate

6  collection agencies);

7      2. Abstract companies doing an escrow business;

8      3. Real estate brokers when acting in the pursuit of

9  their profession;

10     4. Public officers and judicial officers acting under

11  order of a court;

12     5. Licensed attorneys at law;

13     6. Insurance companies;

14     7. Credit unions, including affiliates and

15  subsidiaries thereof;

16     8. Loan and finance companies;

17     9. Retail stores collecting their own accounts;

18     10. Unit Owner's Associations established under the

19  Condominium Property Act, and their duly authorized

20  agents, when collecting assessments from unit owners; and

21     11. Any person or business under contract with a

22  creditor to notify the creditor's debtors of a debt using

23  only the creditor's name.

24  (Source: P.A. 89-387, eff. 1-1-96.)


25     (225 ILCS 425/3) (from Ch. 111, par. 2006)

SB1398 Enrolled                 - 4 -        LRB095 08474 RAS 28653 b

1    (Section scheduled to be repealed on January 1, 2016)

2    Sec. 3. A person, association, partnership, corporation,
3    or other legal entity acts as a collection agency when he or
4    it:

5        (a) Engages in the business of collection for others of
6    any account, bill or other indebtedness;

7        (b) Receives, by assignment or otherwise, accounts,
8    bills, or other indebtedness from any person owning or
9    controlling 20% or more of the business receiving the
10   assignment, with the purpose of collecting monies due on
11   such account, bill or other indebtedness;

12       (c) Sells or attempts to sell, or gives away or
13   attempts to give away to any other person, other than one
14   registered under this Act, any system of collection,
15   letters, demand forms, or other printed matter where the
16   name of any person, other than that of the creditor,
17   appears in such a manner as to indicate, directly or
18   indirectly, that a request or demand is being made by any
19   person other than the creditor for the payment of the sum
20   or sums due or asserted to be due;

21       (d) Buys accounts, bills or other indebtedness ~~with~~
22   ~~recourse~~ and engages in collecting the same; or

23       (e) Uses a fictitious name in collecting its own
24   accounts, bills, or debts with the intention of conveying
25   to the debtor that a third party has been employed to make
26   such collection.

SB1398 Enrolled                - 5 -        LRB095 08474 RAS 28653 b

1    (Source: P.A. 94-414, eff. 12-31-05.)

2        (225 ILCS 425/9.1 new)

3        (Section scheduled to be repealed on January 1, 2016)

4        Sec. 9.1. Communication with persons other than debtor.

5        (a) Any debt collector or collection agency communicating

6    with any person other than the debtor for the purpose of

7    acquiring location information about the debtor shall:

8            (1) identify himself or herself, state that he or she

9        is  confirming  or  correcting  location  information

10       concerning the consumer, and, only if expressly requested,

11       identify his or her employer;

12           (2) not state that the consumer owes any debt;

13           (3) not communicate with any person more than once

14       unless requested to do so by the person or unless the debt

15       collector or collection agency reasonably believes that

16       the  earlier  response  of  the  person  is  erroneous  or

17       incomplete and that the person now has correct or complete

18       location information;

19           (4) not communicate by postcard;

20           (5) not use any language or symbol on any envelope or

21       in the contents of any communication effected by mail or

22       telegram  that  indicates  that  the  debt  collector  or

23       collection agency is in the debt collection business or

24       that the communication relates to the collection of a debt;

25       and

1    (6) after the debt collector or collection agency knows

2    the debtor is represented by an attorney with regard to the

3    subject debt and has knowledge of or can readily ascertain

4    the attorney's name and address, not communicate with any

5    person other than the attorney, unless the attorney fails

6    to respond within a reasonable period of time, not less

7    than 30 days, to communication from the debt collector or

8    collection agency.

9    (225 ILCS 425/9.2 new)

10    (Section scheduled to be repealed on January 1, 2016)

11    Sec. 9.2.    Communication  in  connection  with  debt

12    collection.

13    (a) Without the prior consent of the debtor given directly

14    to the debt collector or collection agency or the express

15    permission of a court of competent jurisdiction, a debt

16    collector or collection agency may not communicate with a

17    debtor in connection with the collection of any debt in any of

18    the following circumstances:

19    (1) At any unusual time, place, or manner that is known

20    or should be known to be inconvenient to the debtor. In the

21    absence of knowledge of circumstances to the contrary, a

22    debt collector or collection agency shall assume that the

23    convenient time for communicating with a debtor is after 8

24    o'clock a.m. and before 9 o'clock p.m. local time at the

25    debtor's location.

1    (2) If the debt collector or collection agency knows

2    the debtor is represented by an attorney with respect to

3    such debt and has knowledge of or can readily ascertain,

4    the attorney's name and address, unless the attorney fails

5    to respond within a reasonable period of time to a

6    communication from the debt collector or collection agency

7    or unless the attorney consents to direct communication

8    with the debtor.

9    (3) At the debtor's place of employment, if the debt

10    collector or collection agency knows or has reason to know

11    that the debtor's employer prohibits the debtor from

12    receiving such communication.

13    (b) Except as provided in Section 9.1 of this Act, without

14    the prior consent of the debtor given directly to the debt

15    collector or collection agency or the express permission of a

16    court of competent jurisdiction or as reasonably necessary to

17    effectuate a post judgment judicial remedy, a debt collector or

18    collection agency may not communicate, in connection with the

19    collection of any debt, with any person other than the debtor,

20    the debtor's attorney, a consumer reporting agency if otherwise

21    permitted by law, the creditor, the attorney of the creditor,

22    or the attorney of the collection agency.

23    (c) If a debtor notifies a debt collector or collection

24    agency in writing that the debtor refuses to pay a debt or that

25    the debtor wishes the debt collector or collection agency to

26    cease further communication with the debtor, the debt collector

SB1398 Enrolled          - 8 -      LRB095 08474 RAS 28653 b

1   or collection agency may not communicate further with the

2   debtor with respect to such debt, except to perform any of the

3   following tasks:

4        (1) Advise the debtor that the debt collector's or

5   collection agency's further efforts are being terminated.

6        (2) Notify the debtor that the collection agency or

7   creditor may invoke specified remedies that are ordinarily

8   invoked by such collection agency or creditor.

9        (3) Notify the debtor that the collection agency or

10  creditor intends to invoke a specified remedy.

11       If such notice from the debtor is made by mail,

12  notification shall be complete upon receipt. (d) For the

13  purposes of this Section, "debtor" includes the debtor's

14  spouse, parent (if the debtor is a minor), guardian, executor,

15  or administrator.


16  (225 ILCS 425/9.3 new)

17  (Section scheduled to be repealed on January 1, 2016)

18  Sec. 9.3. Validation of debts.

19  (a) Within 5 days after the initial communication with a

20  debtor in connection with the collection of any debt, a debt

21  collector or collection agency shall, unless the following

22  information is contained in the initial communication or the

23  debtor has paid the debt, send the debtor a written notice with

24  each of the following disclosures:

25       (1) The amount of the debt.

1     (2) The name of the creditor to whom the debt is owed.

2     (3) That, unless the debtor, within 30 days after

3  receipt of the notice, disputes the validity of the debt,

4  or any portion thereof, the debt will be assumed to be

5  valid by the debt collector or collection agency.

6     (4) That, if the debtor notifies the debt collector or

7  collection agency in writing within the 30-day period that

8  the debt, or any portion thereof, is disputed, the debt

9  collector or collection agency will obtain verification of

10  the debt or a copy of a judgment against the debtor and a

11  copy of the verification or judgment will be mailed to the

12  debtor by the debt collector or collection agency.

13     (5) That upon the debtor's written request within the

14  30-day period, the debt collector or collection agency will

15  provide the debtor with the name and address of the

16  original creditor, if different from the current creditor.

17  If the disclosures required under this subsection (a) are

18  placed on the back of the notice, the front of the notice

19  shall contain a statement notifying debtors of that fact.

20     (b) If the debtor notifies the debt collector or collection

21  agency in writing within the 30-day period set forth in

22  paragraph (3) of subsection (a) of this Section that the debt,

23  or any portion thereof, is disputed or that the debtor requests

24  the name and address of the original creditor, the debt

25  collector or collection agency shall cease collection of the

26  debt, or any disputed portion thereof, until the debt collector

SB1398 Enrolled               - 10 -        LRB095 08474 RAS 28653 b

1    or collection agency obtains verification of the debt or a copy

2    of a judgment or the name and address of the original creditor

3    and mails a copy of the verification or judgment or name and

4    address of the original creditor to the debtor.

5        (c) The failure of a debtor to dispute the validity of a

6    debt under this Section shall not be construed by any court as

7    an admission of liability by the debtor.


8        (225 ILCS 425/9.4 new)

9        (Section scheduled to be repealed on January 1, 2016)

10       Sec. 9.4. Debt collection as a result of identity theft.

11       (a) Upon receipt from a debtor of all of the following

12   information, a debt collector or collection agency must cease

13   collection activities until completion of the review provided

14   in subsection (d) of this Section:

15       (1) A copy of a police report filed by the debtor

16       alleging that the debtor is the victim of an identity theft

17       crime for the specific debt being collected by the debt

18       collector.

19       (2) The debtor's written statement that the debtor

20       claims to be the victim of identity theft with respect to

21       the specific debt being collected by the debt collector,

22       including (i) a Federal Trade Commission's Affidavit of

23       Identity Theft, (ii) an Illinois Attorney General ID Theft

24       Affidavit, or (iii) a written statement that certifies that

25       the representations are true, correct, and contain no

SB1398 Enrolled                 - 11 -        LRB095 08474 RAS 28653 b

1   material omissions of fact to the best knowledge and belief
2   of the person submitting the certification. This written
3   statement must contain or be accompanied by, each of the
4   following, to the extent that an item listed below is
5   relevant to the debtor's allegation of identity theft with
6   respect to the debt in question:
7       (A) A statement that the debtor is a victim of
8   identity theft.
9       (B) A copy of the debtor's driver's license or
10  identification card, as issued by this State.
11      (C) Any other identification document that
12  supports the statement of identity theft.
13      (D) Specific facts supporting the claim of
14  identity theft, if available.
15      (E) Any explanation showing that the debtor did not
16  incur the debt.
17      (F) Any available correspondence disputing the
18  debt after transaction information has been provided
19  to the debtor.
20      (G) Documentation of the residence of the debtor at
21  the time of the alleged debt, which may include copies
22  of bills and statements, such as utility bills, tax
23  statements, or other statements from businesses sent
24  to the debtor and showing that the debtor lived at
25  another residence at the time the debt was incurred.
26      (H) A telephone number for contacting the debtor

SB1398 Enrolled                  – 12 –        LRB095 08474 RAS 28653 b

1     concerning any additional information or questions or
2     direction that further communications to the debtor be
3     in writing only, with the mailing address specified in
4     the statement.
5          (I)  To  the  extent  the  debtor  has  information
6     concerning  who  may  have  incurred  the  debt,  the
7     identification of any person whom the debtor believes
8     is responsible.
9          (J) An express statement that the debtor did not
10    authorize the use of the debtor's name or personal
11    information for incurring the debt.
12      (b)  A written  certification  submitted  pursuant  to item
13    (iii) of paragraph (2) of subsection (a) of this Section shall
14    be sufficient if it is in substantially the following form:
15        "I certify that the representations made are true, correct,
16        and contain no material omissions of fact known to me.

17        (Signature)

18        (Date)"

19      (c) If a debtor notifies a debt collector or collection
20    agency orally that he or she is a victim of identity theft, the
21    debt collector or collection agency shall notify the debtor
22    orally or in writing, that the debtor's claim must be in
23    writing. If a debtor notifies a debt collector or collection

SB1398 Enrolled          - 13 -        LRB095 08474 RAS 28653 b

1    agency in writing that he or she is a victim of identity theft,

2    but omits information required pursuant to this Section, if the

3    debt collector or collection agency does not cease collection

4    activities, the debt collector or collection agency must

5    provide written notice to the debtor of the additional

6    information that is required or send the debtor a copy of the

7    Federal Trade Commission's Affidavit of Identity Theft form.

8        (d) Upon receipt of the complete statement and information

9    described in subsection (a) of this Section, the debt collector

10   shall review and consider all of the information provided by

11   the debtor and other information available to the debt

12   collector or collection agency in its file or from the

13   creditor. The debt collector or collection agency may

14   recommence debt collection activities only upon making a good

15   faith determination that the information does not establish

16   that the debtor is not responsible for the specific debt in

17   question. The debt collector or collection agency must notify

18   the consumer in writing of that determination and the basis for

19   that determination before proceeding with any further

20   collection activities. The debt collector's or collection

21   agency's determination shall be based on all of the information

22   provided by the debtor and other information available to the

23   debt collector or collection agency in its file or from the

24   creditor.

25       (e) No inference or presumption that the debt is valid or

26   invalid or that the debtor is liable or not liable for the debt

SB1398 Enrolled                    - 14 -        LRB095 08474 RAS 28653 b

1    may arise if the debt collector or collection agency decides

2    after the review described in subsection (d) to cease or

3    recommence the debt collection activities. The exercise or

4    non-exercise of rights under this Section is not a waiver of

5    any other right or defense of the debtor or debt collector.

6        (f) A debt collector or collection agency that (i) ceases

7    collection activities under this Section, (ii) does not

8    recommence those collection activities, and (iii) furnishes

9    adverse information to a consumer credit reporting agency, must

10   notify the consumer credit reporting agency to delete that

11   adverse information.


12       (225 ILCS 425/9.7 new)

13       Sec. 9.7. Enforcement under the Consumer Fraud and

14   Deceptive Business Practices Act. The Attorney General may

15   enforce the knowing violation of Section 9 (except for items

16   (1) through (9) and (19) of subsection (a)), 9.1, 9.2, 9.3, or

17   9.4 of this Act as an unlawful practice under the Consumer

18   Fraud and Deceptive Business Practices Act.


19       (225 ILCS 425/2.01 rep.)

20       (225 ILCS 425/2.02 rep.)

21       Section 10. The Collection Agency Act is amended by

22   repealing Sections 2.01 and 2.02.


23       Section 99. Effective date. This Act takes effect January

24   1, 2008.

STATE OF ILLINOIS
95th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

64th Legislative Day                                5/30/2007

Mautino:   "I'm just checking to see the numbers on that.  From
      what I see, the… the funds itself that he has for this year
      are at the levels… levels consistent with what the Expense
      Fund has been."

Black:   "Well, what's responsible for the big jump in General
      Revenue Funds being transferred to the Audit Expense Fund?
      It's up eight million dollars ($8,000,000) from last year."

Mautino:   "Bill, if you would, and I'll… Mr. Speaker, if you'd
      take this out of the record for one second.  Let me…"

Black:   "I'd appreciate that.  Thank you very much,
      Representative."

Mautino:   "…get on the same page and then we'll come back in,
      I'll have that answer for you."

Black:  "Yeah.  Thank you.  Okay."

Speaker Hannig:   "Out of the record.  Representative Colvin, you
      have Senate Bill 1398.  Representative Colvin, do you wish
      us to read this Bill?  Representative Colvin, do you wish
      us to read the Bill?  Mr. Clerk, read the Bill."

Clerk Mahoney:   "Senate Bill 1398, a Bill for an Act concerning
      regulation.  Third Reading of this Senate Bill."

Speaker Hannig:   "The Gentleman from Cook, Representative
      Colvin."

Colvin:   "Thank you, Mr. Speaker and Ladies and Gentlemen of the
      House.   I offer for your consideration Senate Bill 1398
      which amends the Collection Agency Act.  Senate Bill 1398
      is Attorney General Lisa Madigan's Bill that amends the
      Collection Agency Act to require debt collectors to follow
      certain procedures in its attempts to collect debt from
      debtors.   In sum, the Bill harmonizes State Law with

STATE OF ILLINOIS
95th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

64th Legislative Day                              5/30/2007

Federal Law providing four (4) major points: providing that
upon request of the consumer a debt collector must either
validate the debt or stop collection of it.    It also
requires the debt collector to cease communication upon
written request of the debtor.  It expands the definition
of debt collector to include rapidly growing numbers of
debt buyers in the industry and creating a process by which
the victims of identity theft may clear their credit
reports of debts incurred by ID theft.  I'll be happy to
answer any questions."

Speaker Hannig:  "This is on the Order of Short Debate. Does
    anyone stand in response?  The Gentleman from McHenry,
    Representative Franks."

Franks:  "Thank you, Mr. Speaker.  Will the Sponsor yield?"

Speaker Hannig:  "Indicates he'll yield."

Franks:  "Representative, who would this apply to?  Would it
    just apply to collection agencies or anyone who is a debt
    collector?"

Colvin:  "Anyone who is a debt collector.  So, yes, it would
    apply to those agencies that collect, but it also extends
    the provisions of this Act to those who so-called buy debt.
    Those individuals who call people's homes and offer to buy
    debt at a… at a… who buy debt at a reduced rate and then
    begin to try to collect the debt through… as a pass-through
    company from the original debtor."

Franks:  "Under the Fair Debt Collection Practices Act,
    attorneys… which is a Federal Act… attorneys have been
    deemed to be construed as collectors.  In this Bill, would
    attorneys also be deemed to be considered collectors?"

STATE OF ILLINOIS
95th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

64th Legislative Day                                        5/30/2007

Colvin:   "If they're in the act of collecting a debt, indeed, they would be."

Franks:   "I have an attorney here who says that attorneys are exempted from the Debt Collection Act.  And I believe that this Bill, the way it's written, is amending the Debt Collection Act."

Colvin:   "That's correct, it is."

Franks:   "So, I guess, if you have another… if you have a staff member or something I'd just like to know, because if it's just amending the Debt Collection Act it would not pertain to attorneys.  And that's what I want to find out."

Colvin:   "The Act, Representative Franks… however those provisions are currently written in the law would not change.  As a lawyer, you may know, but this Act does not… those lawyers who may be acting upon… you mean, as acting on the behalf of a client? I believe the provision of the law doesn't change that."

Franks:   "I know and there's the problem, because there is a Federal Law."

Colvin:   "That's correct."

Franks:   "And the Federal Law indicates that attorneys who collect debts for those other than themselves…"

Colvin:   "It doesn't change that."

Franks:   "Okay.  Give me one second.  I've got my expert staff here. Okay.  In the… Okay. I think we have clarification. This Bill exempts banks, for instance, and it also…"

Colvin:   "That's right."

Franks:   "I'm sorry, the Act."

STATE OF ILLINOIS
95th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

64th Legislative Day                                5/30/2007


Colvin:  "Right.  Again, what it does is harmonizes State Law
     with what is law at the federal level."

Franks:  "Thank you.  I appreciate it.  Thank you for your
     time."

Speaker Hannig:  "Any further discussion?  Representative Colvin
     to close."

Colvin:  "Again, it simply harmonizes our State Laws with the
     Federal Laws that are already in existence I'd ask for an
     'aye' vote.  Thank you."

Speaker Hannig:  "The question is, 'Shall this Bill pass?' All
     in favor vote 'aye; opposed 'nay'.  The voting is open.
     Have all voted who wish?  Have all voted who wish?  Have
     all voted who wish?  Representative Wait, Verschoore,
     McAuliffe, do you wish to be recorded?  Mr. Clerk, take the
     record. On this question, there are 116 voting 'yes' and 0
     voting 'no'.  And this Bill, having received a
     Constitutional Majority, is hereby declared passed.  On
     page 12 of the Calendar, under Senate Bills-Third Reading,
     Representative Mautino, you have Senate Bill 1400. Out of
     the record.  Representative Hamos, you have Senate Bill
     1419.  Mr. Clerk, read the Bill."

Clerk Mahoney:  "Senate Bill 1419, a Bill for an Act concerning
     safety.  Third Reading of this Senate Bill."

Speaker Hannig:  "Representative Hamos."

Hamos:  "Thank you, Speaker, Ladies and Gentlemen. This Bill
     eliminates inconsistencies within the Environmental
     Protection Act to clarify that the Illinois EPA may adopt
     the federally required Clean Air Act Interstate Rule which
     we call CAIR.  This does not expand the powers of the EPA.

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

NORTH STAR CAPITAL ACQUISITION LLC      No.    08 M1 123089
                  Plaintiff

vs.                               Return Date:    APR 2 2 2008

BEN WASHINGTON

                     Defendant          contract
                                        Amount claimed: $915.38
                                        Plus court costs

### COMPLAINT

NOW COMES the Plaintiff, by and through its attorneys, Blitt and Gaines, P.C., and complaining of the Defendant(s), states as follows:

1.     The Defendant(s) utilized a charge account and/or line of credit issued by Plaintiff or its assignors whereby Defendant(s) could charge goods and services to their account and/or receive cash advances.

2.     The Defendant(s) subsequently defaulted by failing to pay for the indebtedness incurred resulting in the balance due Plaintiff of $915.38.

3.     Due demand has been made on the Defendant(s) to pay this amount and the Defendant(s) have failed to do so.

      WHEREFORE, Plaintiff prays for judgment against the Defendant(s) in the amount of $915.38 plus interest and court costs.

Blitt and Gaines, P.C.
Attorney for Plaintiff
661 Glenn Avenue
Wheeling, IL 60090
(847) 403-4900
32887

      This is an attempt to collect a debt and any information will be used for that purpose.

07-61085-0
3850-05



NORTH STAR CAPITAL ACQUISITION LLC
             Plaintiff

vs.

BEN WASHINGTON
                      Defendant

4447961115760221

### AFFIDAVIT

I, _Ta'Nela Beckwith_ , being first duly sworn upon oath depose and state as follows:

1. That I am the agent in the above captioned matter and I am authorized and qualified to make this Affidavit in support for the judgment against the above named Defendant;

2. That Plaintiff is the purchaser or assignee of the Defendant's account from the original creditor, Credit One Bank;

3. That Plaintiff maintains, in the regular course of business, computer records on which entries are made by a person with knowledge of the information therein and/or information transmitted from a person with such knowledge;

4. That after allowing for all offsets and credits, there remains a balance due on this account in the amount of $915.38.

5. That if called upon affiant can testify at trial as to all facts pertaining to this matter.

FURTHER AFFIANT SAYETH NOT.

Subscribed and sworn to before me
this _14_ day of _Dec_ 2007

NOTARY PUBLIC

07-61085-0
3850-05
W181584

07/21/2008 09:54 FAX 630 407 8932                                    ☑001

1

1   STATE OF ILLINOIS   )
                        )SS:
2   COUNTY OF DU PAGE   )

3
        IN THE CIRCUIT COURT OF DUPAGE COUNTY
4      FOR THE 18TH JUDICIAL CIRCUIT OF ILLINOIS

5   UNIFUND CCR PARTNERS,              )
                                       )
6                  Plaintiff,          )
                                       )
7           vs.                        ) No. 08 AR 22
                                       )
8   PAUL COX,                          )
                                       )
9              Defendant.              )   **ORIGINAL**

10

11          REPORT OF PROCEEDINGS had at the

12  hearing of the above-entitled cause, before the

13  Honorable Joseph S. Bongiorno, recorded on the

14  DuPage County Computer Based Digital Recording

15  System, DuPage County, Illinois, transcribed by

16  Raymond F. Peters, Certified Shorthand Reporter,

17  commencing on Wednesday, the 11th day of April,

18  2008.

19  PRESENT:

20  MS. KATHLEEN A. KELLEY,

21      appeared on behalf of the plaintiff;

22  MR. DANIEL A. EDELMAN,

23      appeared on behalf of the defendant.

24  Raymond F. Peters, CSR #84-002123



07/21/2008 09:54 FAX 630 407 8932                                                          002

2

1    THE COURT:  Unifund CCR Partners vs. Paul Cox.

2    MR. EDELMAN:  Defendant.  Good morning, your

3    Honor.  Daniel A. Edelman for the defendant.

4    MS. KELLEY:  Good morning, your Honor.  Kathleen

5    Kelley for the plaintiff.  This is our motion to

6    Dismiss for Lack of Standing under 2-619.  A

7    briefing schedule was set.  Defendant filed a

8    response and we filed a reply.

9    THE COURT:  I have received that.  Both parties

10   are answering ready on the motion?

11   MR. EDELMAN:  Yes, your Honor.

12   THE COURT:  You are number one on the contested

13   call.

14   MS. KELLEY:  Yes, your Honor.  Thank you.

15   MR. EDELMAN:  Thank you.

16              (Whereupon the Court attended to

17              other matters on its call, after

18              which the following proceedings were

19              had herein:)

20   THE COURT:  Recall, Unifund Partners vs. Paul

21   Cox. This is plaintiff's -- strike that,

22   defendant's 216 motion to Dismiss for Lack of

23   Standing.  Counsel, did you wish to offer further

24   argument or rely upon your brief?

3

1    MR. EDELMAN:  I am happy to rely upon my brief,

2  your Honor.

3    THE COURT:  Counsel, did you wish to offer any

4  argument?

5    MS. KELLEY:  I am happy to rely on my response

6  brief but I just wanted to address one case that

7  was mentioned in their reply.

8      In their reply, they state that *Sawyer*,

9  essentially, cited to the *Sherman* case with

10  approval.

11      Now, *Sawyer* was Supreme Court of Illinois,

12  decided 1982.  It does refer to the *Sherman* case,

13  however, the *Sawyer* case is distinguishable because

14  it doesn't discuss the act.  It doesn't discuss the

15  Illinois Collection Agency Act at all.  It

16  completely discusses another act.

17      It doesn't state that it agrees with

18  *Sherman's* ultimate holding, the fact that the

19  Collection Agency Act gives a private right of

20  action.  It doesn't discuss the Court's analysis,

21  the *Sherman's* Court's analysis.  It merely says

22  that it agrees with the test, the four-pronged test

23  that the *Sherman* Court applied.  And it also cites

24  it as one of four -- one of five other cases that

4

1    have found that a statute can give a litigant a

2    private right of action even though it doesn't

3    expressly state that in this statute.  So while

4    it --

5    THE COURT:  Is this a cause of action that is

6    being asserted or a defense?

7    MS. KELLEY:  It is a defense, your Honor.

8    THE COURT:  Okay.  Anything further?

9    MS. KELLEY:  No.

10   MR. EDELMAN:  Your Honor, I don't think that

11   whether there is a private right of action has

12   anything to do with the matter.

13   THE COURT:  I agree.

14   MR. EDELMAN:  We are asserting as a defense, I

15   think, noncompliance with the assignment

16   documentation requirements of 8(b) of the

17   Collection Agency Act.  The key case is *Business*

18   *Service Bureau vs. Webster,* where the Appellate

19   Court said that unless you comply with the act

20   literally, you do not have standing and the

21   defendant is entitled to judgment.  The purpose of

22   the requirement is to protect people against

23   duplicative litigation by people who don't own the

24   debt and don't have a right to sue.

1    THE COURT:  Well, let me ask you a question,

2    counsel.

3    MR. EDELMAN:  Yes, sir.

4    THE COURT:  Your motion purports to be a 216 --

5    2-619.

6    MR. EDELMAN:  2-619 motion.

7    THE COURT:  And -- but, however, it's not

8    verified.  I took note of that immediately.  The

9    complaint is verified.  This is not verified.  So

10   how am I to assume that the facts contained in the

11   complaint are not true?

12   MR. EDELMAN:  I think that where a defense such

13   as standing with the statute of limitations is

14   revealed by the complaint and the attachments, then

15   you can file a 2-619 motion raising that

16   deficiency.

17           In this case, we have a complaint.  We

18   have an affidavit by the assignee, not the

19   assignor.  None of these comply with 8(b).  If you

20   compare the two, they clearly do not.  The key

21   requirement of 8(b) is that a verified signature of

22   the assignor, the person purporting to transfer

23   title --

24   THE COURT:  Right.  How do I know they don't

6

1  have that in their possession?

2      MR. EDELMAN:  Well, if they did, then they

3  should have attached it.  *Candice vs. Ricketts,*

4  also from the Appellate Court says that where you

5  are not the payee of an obligation, and they

6  clearly state they are not, then the assignment

7  transfer of the title to the plaintiff is in a

8  writing upon which the action is founded it must be

9  attached.  It isn't.  And I, therefore, submit we

10  are entitled to our defense.

11      THE COURT:  Wouldn't that more appropriately be

12  attached as a 2-615 motion, however, since -- you

13  are asking me to assume that they cannot produce

14  that assignment.

15      MR. EDELMAN:  Well --

16      THE COURT:  And I don't know that.  I suspect

17  it, but I don't know that.

18      MR. EDELMAN:  If they have an assignment, why

19  haven't they produced it?  It's like the Summary

20  Judgment motion, a 2-619 motion.  If the document

21  exists, where is it?

22      THE COURT:  A Summary Judgment motion should be

23  verified, however, because it's based on material

24  facts alleged therein.

7

1    MR. EDELMAN:  If it is, if it raises a factual

2    argument, yes.  But if it simply says the plaintiff

3    has no evidence of a certain thing, it is

4    permissible to file a Summary Judgment motion with

5    or without affidavits.

6    THE COURT:  Well, I am going to treat the 2-619

7    motion as a 2-615 motion.  You may still prevail

8    ultimately on the issues but at this point in time

9    I think it's premature.

10   MS. KELLEY:  Your Honor, can I address one more

11   point?

12   THE COURT:  I grant leave to amend the complaint

13   to attach the assignment as required by law and

14   then if the assignment is sufficient, we will

15   proceed.  If it isn't sufficient, it will be

16   subject to a 2-619 motion.

17   MR. EDELMAN:  Very well, your Honor.

18   MS. KELLEY:  Your Honor, if I may, just one more

19   point.

20        The problem with what the conversation

21   that is going on right here is the fact that

22   according to 2-403, we just need to attach that

23   agreement.  The problem that we have with the

24   Collection Agency Act is that's an entirely

8

1   different type of requirement.  It also says that

2   you need to state the amount.

3       THE COURT:  Well, I am not going to either

4   speculate or adjudicate as to what the requirements

5   of that act are based on your oral representations.

6       MS. KELLEY:  Right.

7       THE COURT:  You can present an assignment.  If

8   it comports with the statute, I suspect then you

9   will prevail.  If it doesn't, I suspect the

10  plaintiff will -- or the defendant will.  So thirty

11  days to amend?

12      MS. KELLEY:  Thank you, your Honor.

13      THE COURT:  And do you want a status date on the

14  amended complaint?

15      MR. EDELMAN:  Yes.

16      THE COURT:  How about May 30th?

17      MR. EDELMAN:  At 8:30, your Honor?

18      THE COURT:  That would be at 9:00 o'clock

19  because it's a status date.

20      MR. EDELMAN:  Thank you, your Honor.

21      THE COURT:  You're welcome.

22
                    (WHICH were all of the proceedings
23                   had at the hearing of the above-
                    entitled cause, this date and time
24                   aforesaid.)

1    STATE OF ILLINOIS   )
                     ) SS:
2    COUNTY OF DU PAGE   )

3

4

5       I HEREBY CERTIFY that I reported in

6    shorthand the proceedings had at the hearing of the

7    above-entitled cause, and that the foregoing Report

8    of Proceedings, consisting of Pages 1 to 9

9    inclusive, is a true, correct and complete

10    transcript of my shorthand notes so taken at the

11    time and place hereinabove set forth.

12

13

14

15

16

17        _____
                 Official Court Reporter,
18    Raymond F. Peters, CSR Lic. No. 84-002123
        Eighteenth Judicial Circuit of Illinois
19                DuPage County.

20

21

22

23

24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No **07-81047-CIV-HURLEY/HOPKINS**



FILED by _JC_ D.C.
ELECTRONIC

**Nov. 5, 2007**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.·MIAMI

HUDSON AND KEYSE, LLC,

Plaintiff,

vs.

GOLDBERG & ASSOCIATES, LLC and
STEVEN GOLDBERG, individually

Defendant.

_____/

### COMPLAINT

Plaintiff, HUDSON AND KEYSE, LLC ("HUDSON AND KEYSE") sues Defendant GOLDBERG & ASSOCIATES, LLC ("GOLDBERG, LLC") and STEVEN GOLDBERG ("GOLDBERG") individually, and as managing member of GOLDBERG LLC and alleges as follows:

### GENERAL ALLEGATIONS

1.    This is an action for damages arising out of a breach of contract and other improper acts by Defendants.

2.    This Court has jurisdiction pursuant to 28 U.S.C. §1332.

3.    The amount in controversy exceeds $75,000 as set forth below.

4.    Venue is proper in the Southern District of Florida as defendant's principal place of business is in Boca Raton, Florida, and upon information and belief, Defendant GOLDBERG resides within this District.

5.    All conditions precedent to instituting this action have occurred, been performed, or have been waived.



1406008v1 838180

Case No.

## THE PARTIES

6.    Plaintiff HUDSON AND KEYSE is a Delaware corporation with its principle place of business in Ohio.

7.    Defendant GOLDBERG LLC is a Florida limited liability corporation authorized to do business in Palm Beach County, Florida.

8.    Defendant GOLDBERG in a resident of Palm Beach County Florida and at all relevant times represented to HUDSON AND KEYSE that he is and was authorized to act on behalf of GOLDBERG LLC.

9.    Defendant GOLDBERG is the managing member, operating manager, secretary and treasurer of GOLDBERG LLC.

### The Contract and Breach

10.    On or about July 27, 2007, HUDSON AND KEYSE as Seller and GOLDBERG LLC as Purchaser entered into an Account Purchase and Sale Agreement (the "Contract"), a copy of which is attached hereto as Exhibit A.  The subject of the Contract was certain consumer debt accounts which had not been paid.

11.    Pursuant to Paragraph 18 of the Contract, GOLDBERG LLC acknowledged that the information relating to the consumer accounts was confidential and proprietary information of HUDSON AND KEYSE (the "confidential and proprietary information").

12.    Pursuant to Paragraph 3 of the Contract, GOLDBERG LLC was obligated to pay HUDSON AND KEYSE the Purchase Price of the Contract prior to the Closing Date for the consummation of the Contract.   The Contract established that the Closing Date for the Contract was July 27, 2007 and that the Purchase Price was $2,416,273.43.  Exhibit A.

13.    GOLDBERG LLC has failed and refused to pay the Purchase Price to HUDSON AND KEYSE.

2

14.     Despite its failure to pay the Purchase Price, Defendant GOLDBERG LLC and or GOLDBERG has obtained the confidential and proprietary information concerning the consumer accounts which were the subject of the Contract.

15.     Upon information and belief, GOLDBERG LLC and/or GOLDBERG have used the confidential and proprietary consumer information improperly obtained to attempt to collect the amounts owed by the consumers for the benefit of GOLDBERG LLC and/or GOLDBERG and/or unknown third parties despite the fact that HUDSON AND KEYSE is the true owner of the accounts and is the only party entitled to payment thereunder.

16.     Upon information and belief, GOLDBERG LLC and/or GOLDBERG has sold or attempted to sell and assign of some or all of the confidential and proprietary information concerning the consumer accounts to third parties. Such actions are in direct violation of Paragraph 17 of the Contract pursuant to which GOLDBERG LLC agreed that it would not make any unauthorized disclosures of or use any such information .

17.     HUDSON AND KEYSE has demanded payment under the Contract, but GOLDBERG LLC has failed to respond to those demands. Copies of the demand letters are attached hereto as Exhibit B.

18.     HUDSON AND KEYSE has also demanded that GOLDBERG LLC and GOLDBERG cease and desist any efforts to collect upon the consumer accounts and/or assign those accounts, but GOLDBERG LLC and GOLDBERG have failed and refused to cease such efforts. Copies of the Cease and Desist demand letters are attached hereto as Exhibit C.

19.     Based upon prior communications from GOLDBERG LLC, HUDSON AND KEYSE believes that GOLDBERG LLC may attempt to excuse its failure to perform under the Contract based upon the actions of some unknown third party. However, in Paragraph 13 of the

14406008v1 838180

Case No.

Contract, GOLDBERG LLC represented and warranted that "Purchaser is not relying upon the continued actions or efforts ... of any third party in connection with its decision to purchase the Accounts. The risks attendant to the potential failure or refusal of third parties to assist or cooperate with Purchase ... shall be borne by Purchaser." Consequently, the actions of any third party have no bearing on GOLDBERG LLC's liability under the Contract. Moreover, GOLDBERG LLC has failed and refused to return the confidential and proprietary consumer accounts information that was to be sold pursuant to the Contract, even though GOLDBERG LLC has acknowledged that it has not performed the Contract and has not paid the Purchase Price.

20.    HUDSON AND KEYSE has retained Hinshaw & Culbertson LLP to represent its interests in this matter, and is obligated to pay Hinshaw & Culbertson LLP its attorney's fees and costs incurred.

21.    HUDSON AND KEYSE is entitled to the recovery of attorney's fees and costs pursuant to the wrongful act doctrine and under Florida Statutes §57.105 and §688.005.

## COUNT I – BREACH OF CONTRACT

HUDSON AND KEYSE realleges the allegations of paragraphs 1 through 20 and incorporates them by reference herein.

22.    This is an action for breach of contract against GOLDBERG LLC

23.    GOLDBERG LLC entered into an agreement with HUDSON AND KEYSE to purchase certain consumer accounts as evidenced by the Exhibits to the Contract.

24.    GOLDBERG LLC has breached the Contract by failing and/or refusing to make any payment thereunder.

25.    At present, HUDSON AND KEYSE is owed Two Million, Four Hundred Sixteen Thousand Two Hundred Seventy Three and 43/100 Dollars ($2,416,273.43) under the Contract,

4

14406008v1 838180

Case No.

together with interest thereon, and has demanded payment, but GOLDBERG LLC has refused to pay, in breach of the Contract.

26.    HUDSON AND KEYSE has met all conditions precedent to bringing this action or such conditions have been waived.

WHEREFORE, HUDSON AND KEYSE demands judgment against GOLDBERG LLC in the amount of Two Million, Four Hundred Sixteen Thousand Two Hundred Seventy Three and 43/100 Dollars ($2,416,273.43) under the Contract, together with prejudgment interest, post-judgment interest, costs, attorney's fees pursuant to Florida Statute §57.105 and such other and further relief as this Court deems just and proper.

## COUNT II – UNJUST ENRICHMENT

HUDSON AND KEYSE realleges the allegations of paragraphs 1 through 20 and incorporates them by reference herein.

27.    This is an action for unjust enrichment against GOLDBERG LLC and GOLDBERG.

28.    GOLDBERG LLC and GOLDBERG have knowingly used and benefitted from the confidential and proprietary information and never made any payment of the Purchase Price under the Contract.

29.    GOLDBERG LLC and GOLDBERG have retained the confidential and proprietary information despite knowing they are not entitled thereto.

30.    Under the circumstances, it would be inequitable for GOLDBERG LLC and GOLDBERG to have benefited from use of the confidential and proprietary information without having paid for it.

31.    HUDSON AND KEYSE further seeks a declaration that both GOLDBERG LLC and GOLDBERG be held jointly and severally liable for the benefit conferred on each.

5

14406008v1 838180

Case No.

WHEREFORE, HUDSON AND KEYSE requests that this Court enter a judgment in its favor and against GOLDBERG LLC and GOLDBERG jointly and severally for the Purchase Price under the contract or, in the alternative, for an amount equal to the profit made by GOLDBERG LLC and/or GOLDBERG through the improper use of HUDSON AND KEYSE' confidential and proprietary information, together with post judgment interest thereon, costs, attorney's fees pursuant to Florida Statute §57.105, return of the confidential and proprietary information and such other and further relief this Court deems just and proper.

## COUNT III – CONSTRUCTIVE TRUST OR EQUITABLE LIEN

HUDSON AND KEYSE realleges the allegations of paragraphs 1 through 20 and incorporates them by reference herein.

32.    This is an action for constructive trust or equitable lien against GOLDBERG LLC and GOLDBERG.

33.    By virtue of the parties' Contract, GOLDBERG LLC had an obligation to pay the Purchase Price due under the Contract.

34.    GOLDBERG LLC has failed and refused to pay the Purchase Price despite the fact that it and GOLDBERG have received a benefit from HUDSON AND KEYSE in the form of the confidential and proprietary consumer information described above.

35.    HUDSON AND KEYSE is entitled to have a constructive trust or equitable lien imposed upon any monies, profit or other remuneration GOLDBERG LLC and/or GOLDBERG have obtained by virtue of their improper use of HUDSON AND KEYSE confidential and proprietary information.

36.    Without the imposition of said trust or lien, GOLDBERG LLC and/or GOLDBERG stand to be unjustly enriched at the expense of HUDSON AND KEYSE.

14406008v1 838180

Case No.

37.    Equity demands that the Court look to the substance of the transactions set forth herein and to impose a constructive trust and/or equitable lien upon any proceeds GOLDBERG LLC and/or GOLDBERG have derived from subject matter of the Contract for which GOLDBERG LLC has failed and refused to pay.

WHEREFORE, HUDSON AND KEYSE request that this Court enter a judgment as set forth herein, together with costs, interest and attorney's fees pursuant to Florida Statute §57.105 and such other and further relief as this Court deems just and proper.

## COUNT IV – MISAPPROPRIATION OF TRADE SECRETS

HUDSON AND KEYSE realleges the allegations of paragraphs 1 through 20 and incorporates them by reference herein.

38.    This is an action for misappropriation of trade secrets against GOLDBERG LLC and GOLDBERG.

39.    The confidential and proprietary consumer information described above is a trade secret as defined by Florida Statute §688.002(4).

40.    GOLDBERG LLC and/or GOLDBERG acquired knowledge of the trade secret confidential and proprietary consumer information owned and possessed by HUDSON AND KEYSE through improper means as set forth in Florida Statute §688.002(2).

41.    GOLDBERG LLC and/or GOLDBERG knowingly and willfully caused such information to be used for its or his own financial gain.

42.    At all material times, GOLDBERG LLC and GOLDBERG knew that HUDSON AND KEYSE regarded the above-referenced information as trade secrets, confidential and proprietary information.

43.    Due to GOLDBERG LLC' s and/or GOLDBERG's willful, malicious and knowing use of HUDSON AND KEYSE trade secrets and confidential and proprietary

7

Case No.

information, HUDSON AND KEYSE has suffered and will continue to suffer substantial monetary damages.

WHEREFORE, HUDSON AND KEYSE requests that this Court enter judgment against GOLDBERG LLC and GOLDBERG jointly and severally for:

a.  Temporary, preliminary and permanent injunctive relief pursuant to Florida Statute §688.003, restraining and enjoining GOLDBERG LLC and GOLDBERG and each of their agents, officers, directors, employees, assignees and successors and all those persons and/or entities in concert of participation with them from using the confidential and proprietary consumer information;

b.  Monetary damages and exemplary damages pursuant to Florida Statute §688.004(1) and (2);

c.  Attorney's fees pursuant to the wrongful act doctrine and Florida Statutes §57.105 and §688.005;

d.  such other and further relief as this Court deems just and proper.

### COUNT V – COMMON LAW FRAUD IN THE INDUCEMENT

HUDSON AND KEYSE realleges the allegations of paragraphs 1 through 20 and incorporates them by reference herein.

44.  This is an action for common law fraud in the inducement against GOLDBERG LLC and GOLDBERG.

45.  GOLDBERG LLC and GOLDBERG represented to HUDSON AND KEYSE that they intended to pay the Purchase Price under the Contract.

46.  GOLDBERG LLC and GOLDBERG knew those representations were false when they were made.

8

14406008v1 838180

Case No.

47.     GOLDBERG LLC's and GOLDBERG's intention in making the representations was to induce HUDSON AND KEYSE to provide them with the tapes described in Paragraph 4F of the Contract and to provide them with redacted information related to the confidential and proprietary information which was the subject matter of the Contract.

48.     In reliance upon the representations, HUDSON AND KEYSE provided the information to GOLDBERG LLC.

49.     Upon information and belief GOLDBERG LLC and GOLDBERG have used the information provided to them to acquire by improper means the entire body of information which was the subject of the Contract.

50.     As a result of HUDSON AND KEYSE reliance upon GOLDBERG LLC's and GOLDBERG's representations, HUDSON AND KEYSE have sustained damages.

WHEREFORE, HUDSON AND KEYSE requests that this Court enter judgment against GOLDBERG LLC and GOLDBERG jointly and severally, for damages together with post judgment interest thereon, costs and attorney's fees pursuant to the wrongful act doctrine and for such other and further relief as this Court deems just and proper.

## COUNT VI – ACCOUNTING

HUDSON AND KEYSE realleges the allegations of paragraphs 1 through 20 and incorporates them by reference herein.

51.     This is an action for an accounting from GOLDBERG LLC and GOLDBERG.

52.     Pursuant to the Contract, GOLDBERG LLC was required to pay HUDSON AND KEYSE the Purchase Price under the Contract. GOLDBERG LLC has failed and refused to pay the Purchase Price.

1440600Bv1 838180

Case No.

53.    Despite its failure to pay the Purchase Price, GOLDBERG LLC and/or GOLDBERG obtained the confidential and proprietary consumer information which was the subject of the Contract by improper means.

54.    Upon information and belief, GOLDBERG LLC and/or GOLDBERG have used that confidential and proprietary information for its or his own personal gain. HUDSON AND KEYSE is entitled to the profits that GOLDBERG LLC and/or GOLDBERG have obtained by the improper use of the information.

55.    As a result of the improper use of HUDSON AND KEYSE's confidential and proprietary information, an accounting from GOLDBERG LLC and GOLDBERG is appropriate to determine the use, sale, collateralization, disposition and profits that have occurred and been obtained by Defendants and any other person, including any their assignees.

WHEREFORE, HUDSON AND KEYSE requests that this Court enter judgment in its favor for an accounting from GOLDBERG LLC and GOLDBERG for any and all monies or other remuneration it or he has obtained through use of the confidential and proprietary information.

## COUNT VII – INJUNCTION

HUDSON AND KEYSE realleges the allegations of paragraphs 1 through 20 and incorporates them by reference herein.

56.    This is an action for an injunction against GOLDBERG LLC and GOLDBERG.

57.    HUDSON AND KEYSE has suffered irreparable harm by GOLDBERG LLC's and/or GOLDBERG's acquisition and use of the confidential and proprietary information in that, upon information and belief, GOLDBERG LLC and/or GOLDBERG have obtained or have attempted to obtain payment on the consumer accounts which were the subject of the Contract. As a result, the confidential information of the consumers contained in the account information

10

14406008v1 838180

Case No.

may have been or may be publicly disclosed or disclosed in a manner which does not comply with applicable state and federal laws.

58.    HUDSON AND KEYSE does not have an adequate remedy at law to retrieve any such information which has been disclosed.

59.    An injunction may prevent any further disclosure of such private information in the future.

60.    An injunction could also prevent GOLDBERG LLC and/or GOLDBERG from further disclosing any information which they have already made use of.

61.    HUDSON AND KEYSE has a substantial likelihood of success on the merits in this action in that all available evidence shows that GOLDBERG LLC and GOLDBERG have breached the Contract by failing to pay for the benefit therefrom

62.    HUDSON AND KEYSE has a substantial likelihood of success on the merits in this action in that all available evidence shows that GOLDBERG LLC and GOLDBERG are making improper and potentially illegal use of the subject matter of the contract.

63.    The public interest would be served by imposition of an injunction against GOLDBERG LLC and/or GOLDBERG as the personal and private information of consumers is at risk of being disclosed by those parties.

WHEREFORE, HUDSON AND KEYSE requests that this Court impose a temporary and permanent injunction against GOLDBERG LLC and GOLDBERG precluding them from making use of the confidential and proprietary information which they have improperly obtained; and requiring them to return such information to HUDSON AND KEYSE, its proper owner; precluding GOLDBERG LLC and GOLDBERG from disseminating the personal and private information of consumers to any other parties; and requiring GOLDBERG LLC and

11

14406008v1 838180

GOLDBERG to destroy all copies and other documents, including electronic data and storages, that contain the confidential and proprietary information in their possession or control.

## COUNT VIII – RESCISSION

HUDSON AND KEYSE realleges the allegations of paragraphs 1 through 20 and incorporates them by reference herein.

64.    This is an action for rescission of the Contract against GOLDBERG LLC.

65.    GOLDBERG LLC and GOLDBERG represented to HUDSON AND KEYSE that they intended to pay the Purchase Price under the Contract.

66.    GOLDBERG LLC and GOLDBERG knew those representations were false when they were made.

67.    GOLDBERG LLC's and GOLDBERG's intention in making the representations was to induce HUDSON AND KEYSE to provide them with the tapes described in Paragraph 4F of the Contract and to provide them with redacted information related to the confidential and proprietary information which was the subject matter of the Contract.

68.    In reliance upon the representations, HUDSON AND KEYSE provided the information to GOLDBERG LLC.

69.    Upon information and belief GOLDBERG LLC and GOLDBERG have used the information provided to them to acquire by improper means the entire body of information which was the subject of the Contract.

70.    Those actions of GOLDBERG LLC and GOLDBERG constitute a misrepresentation of material facts which GOLDBERG LLC and GOLDBERG knew to be false at the time the misrepresentations were made. GOLDBERG LLC and GOLDBERG intended to induced HUDSON AND KEYSE to rely upon the false statements in entering into the Contract.

12

71.    HUDSON AND KEYSE has been injured by its reliance upon GOLDBERG LLC'S and GOLDBERG'S intentional misrepresentations in that it has been deprived of its confidential and proprietary property.

72.    Upon information and belief HUDSON AND KEYSE's property has been or has been attempted to be transferred to third parties.

73.    Upon information and belief HUDSON AND KEYSE's property has been or may be exposed to liability to those third parties or other unknown third parties by the actions of GOLDBERG LLC and GOLDBERG.

WHEREFORE, HUDSON AND KEYSE requests that this court enter an Order rescinding the Contract and awarding HUDSON AND KEYSE all of its damages incurred as a result of the actions of GOLDBERG LLC and GOLDBERG and for such other and further relief as this Court deems just and proper.

### COUNT IX – FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

HUDSON AND KEYSE realleges the allegations of paragraphs 1 through 20 and incorporates them by reference herein.

74.    This is an action for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. §§501-201 et seq, against GOLDBERG LLC and GOLDBERG.

75.    GOLDBERG LLC and GOLDBERG represented to HUDSON AND KEYSE that they intended to pay the Purchase Price under the Contract.

76.    GOLDBERG LLC and GOLDBERG knew those representations were false when they were made.

77.    GOLDBERG LLC's and GOLDBERG's intention in making the representations was to induce HUDSON AND KEYSE to provide them with the tapes described in Paragraph 4F

13

Case No.

of the Contract and to provide them with redacted information related to the confidential and proprietary information which was the subject matter of the Contract.

78.    By making the false and deceptive representation that GOLDBERG LLC and GOLDBERG intended to and were able to perform their obligations under the Contract, GOLDBERG LLC and GOLDBERG violated the provisions of FDUPTA.

79.    HUDSON AND KEYSE was deceived by the actions of GOLDBERG LLC and GOLDBERG and has suffered a loss as a result of those actions. As a result, HUDSON AND KEYSE is a "person aggrieved" by a violation of FDUPTA.

WHEREFORE, HUDSON AND KEYSE requests that this Court enter judgment in its favor for its actual damages, plus attorney's fees and court costs pursuant to Florida Statute §501.2105.

## DEMAND FOR JURY TRIAL

HUDSON AND KEYSE pursuant to Rule 38, Federal Rules of Civil Procedure demands trial by jury of all issues so triable.

Dated: November 5, 2007

Respectfully submitted,

David P. Hartnett
Monica T. Cronin
dhartnett@hinshawlaw.com
mcronin@hinshawlaw.com
Hinshaw & Culbertson LLP
9155 S. Dadeland Boulevard
Suite 1600
Miami, Florida 33156-2741
Tel. No. 305-358-7747
Fax No. 305-577-1063
Attorneys for Plaintiff HUDSON AND KEYSE, LLC

14

14406008v1 838180